# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALBERT WATERS and | : | CIVIL ACTION |
| LISA WATERS, | : | |
| Plaintiffs, | : | NO. 06-0032 |
| | : | |
| v. | : | |
| | : | |
| NMC-WOLLARD, INC. and | : | |
| HOBART BROTHERS COMPANY, | : | |
| Defendants. | | |

## Memorandum and Order

YOHN, J.                                                          September ___, 2007

Plaintiff Albert Waters brings this products liability, negligence, and breach of warranty

action against defendants Hobart Brothers Company ("Hobart") and NMC-Wollard, Inc.

("NMC")[1] arising out of an accident that occurred while Waters was operating a belt loader in the

course of his employment as a baggage handler at Philadelphia International Airport.  Waters's

wife, Lisa, has filed a loss of consortium claim.   Plaintiffs allege that the belt loader operated by

Waters was defective because it was equipped with only a single handrail and lacked a second

handrail and a midrail.  Both Hobart and NMC have moved for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure on the sole issue of product and manufacturer

---

[1]The revised amended complaint also names as defendants Wollard Airport Equipment,
Inc.; Wollard Equipment Co., Inc.; Northwestern Motor Co., Inc.; Northwestern Motor Co., Inc.,
Division of Mobility, Inc.; Steingart Acquisition Co., Inc.; Criton Technologies; Wollard Airport
Equipment Company; and Ground Power Liquidating, Inc.  However, according to plaintiffs'
response and to the agreement of all parties at oral argument, counsel have stipulated that the
only proper defendants in this case are Hobart and NMC.  (Pl.'s Resp. 1 n.2.)  At oral argument,
plaintiffs further agreed that they will circulate a stipulation to this effect.  Therefore, the other
defendants will be dismissed from the instant action by agreement of counsel.

identification.[2]  Central to both motions is the claim that plaintiffs have failed to identify both the

belt loader involved in Waters's accident and the belt loader's manufacturer.  For the following

reasons, I will grant Hobart's motion and deny NMC's motion.

**I.      Background[3]**

**A.      Waters's Accident on June 1, 2004**

At the time of his injury on June 1, 2004, Waters had been employed by US Airways as a

fleet service agent or a baggage handler for nearly eight years, since July 1, 1996.  (Rev. Am.

Compl. ¶ 13; Pl.'s Dep. 59:6, Apr. 24, 2006.)  As a baggage handler, Waters regularly operated

belt loaders, which are industrial products used to load and unload luggage from an aircraft's

cargo hold by way of a mobile conveyer belt.  (Pl.'s Dep. 59: 8-11; Steingart[4] Aff. ¶ 2.)[5]

While working Gate A-18 of the Philadelphia International Airport on June 1, 2004,

Waters was walking up the raised conveyer belt on the belt loader when he slipped and fell.  He

believes his head struck the belt and that he fell six to seven feet to the ground below.  (Pl.'s Dep.

60:18-24, 71:15-16, 72:17-20, 74:4-12, 77:19-20, 83:8-10, 85:15-16.)  However, without the help

_____

[2]The parties have stipulated that the scope of this motion is limited only to the issue of whether plaintiffs have produced adequate evidence of product and manufacturer identification. (*See* Hobart's Mot. for Summ. J. 2 n.1; NMC's Mot. for Summ. J. 1 n.1; Pl.'s Br. in Opp'n to Defs.' Mots. for Summ. J. 1-2, 6-7.)

[3]The following account contains admitted facts and plaintiffs' factual allegations because when deciding a motion for summary judgment courts must view all facts and inferences in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[4]Kevin Steingart is the President of NMC.  (Steingart Aff. ¶ 1.)

[5]When an aircraft is at its gate, the belt loader is driven up to the aircraft, parked, and its conveyer belt is raised.  A baggage handler then walks up the conveyor belt and gets into the cargo hold of the aircraft to load or unload the aircraft's cargo.  (Steingart Aff. ¶ 2.)

of medical records and other written materials, Waters does not remember much about the day of his accident. (Pl.'s Dep. 60:8-10.)[6]  His first recollection is waking up in an emergency room with bright lights. (*Id*. at 103:11-17.)  Thus, Waters does not know if any person witnessed his accident and he does not recall speaking with any of his co-workers or with the ambulance crew on the way to the hospital. (Pl.'s Dep. 64:11-18, 77:3-15,103:4-11.)

However, Waters encountered three of his co-workers, Orazio Coscia, Mark Vendemia, and Jeffrey Matlack, shortly after the accident. Coscia, Waters's supervisor,[7] was the manager on duty on A West during the morning shift on June 1, 2004. (NMC Ex. H.)  At his deposition in this case, Coscia testified that Waters told him that he took a few steps on the conveyer belt of the belt loader, hit a "rubber part," and then slid. (Coscia Dep. 25:1-11, Dec. 11, 2006.)  When Coscia went out to attempt to investigate the scene of the accident, the plane and equipment were already gone. (Coscia Dep. 25:15-17, 29:19-22, Dec. 11, 2006.)  Vendemia, an international lead agent,[8] spoke with Waters in the break room shortly after the accident while Waters's head was still bleeding. (Vendemia Dep. 11:1-5, Oct. 12, 2006.)  Vendemia testified that while in the break room with Waters for the ten minutes before the ambulance arrived, Waters said that he had fallen and had to get back up to his job because the flight was coming in. (Vendemia Dep.

---

[6]In his deposition taken on April 24, 2006, Waters testified that his "independent recollection" of the accident was triggered by reading through his medical records and through his documentation of a past deposition. He also testified that if he did not look at these records or past testimony before his April 24, 2006 deposition, he would not have remembered what had happened to him on the day of the accident. (Pl.'s Dep. 60:1-10, 61:1-6, 61:12-16, 70:9-15.)

[7]Coscia was in charge of overseeing the staffing, duties, equipment and medical emergencies of approximately forty fleet service agents. (Coscia Dep. 14:4-13, Dec. 11, 2006.)

[8]A lead agent is in charge of the fleet service agents, like Waters, who load the planes. (Vendemia Dep. 8:21-23.)

13:7-9.)  Matlack, another international lead agent,[9] saw Waters after Vendemia had seen him. He was in the lead agent's office when Waters entered with blood on his face.  Waters only said that he was okay, but he did not tell Matlack what had happened.  (Matlack Dep. 19:18-22, 20:14-24, 21:18-24, Nov. 21, 2006.)  The record reflects that none of these three co-workers is able to identify the belt loader Waters was using at the time of his accident.

Waters himself is unable to identify the belt loader involved in his fall.  He did not return to the airport after his accident to look at the belt loader he had operated.  (Pl.'s Dep. 79:19-80:3; 108:10-12.)  He has been unable to identify the serial number of the belt loader, its US Airways identifying number,[10] or any person or documents that can identify the belt loader he was using at the time of the accident.  (NMC Reqs. for Admis. 12-14).  Waters further testified that he does not know who made the belt loader or when it was made.  (Pl.'s Dep. 108:13-16.)

**B.**   **Four Entities Manufactured "Wollard" Belt Loaders for over Two Decades**

The revised amended complaint names both NMC and Hobart as defendants who "designed, manufactured and/or sold" belt loaders (Rev. Am. Compl. ¶ 13.)  However, four different companies manufactured two different models of belt loaders under the "Wollard" name for over two decades – (1) Criton Technologies, through its product line division, Wollard

---

[9]Matlack had scheduled Waters to work on June 1, 2004 with two other fleet service agents on a shift that began at five or six o'clock in the morning, but he does not recall who actually worked with Waters.  (Matlack Dep. 14:17-24, 19:1-5, Nov. 21, 2006.)  Coscia testified that when he went out to the gate to investigate the accident, he spoke to the persons working with Waters on the flight, but he received no additional information from them about the accident.  Coscia does not remember the names of Waters's co-workers.  (Coscia Dep. 29:23-30:13, Dec. 11, 2006.)

[10]The belt loaders used by US Airways are marked by the letters "LD" and identifying numbers.  (Matlack Dep. 29:10-14.)

4

Airport Equipment Company; (2) Wollard Airport Equipment Company, a wholly owned

subsidiary of defendant Hobart ("WAEC"); (3) Wollard Airport Equipment Company, Inc.

("WAEC Inc."); and (4) defendant NMC-Wollard.

From 1983 until 1987, Criton Technologies, a partnership, through its division, Wollard

Airport Equipment Company, developed and sold the TC-886 model belt loader. (Steingart Aff.

¶¶ 13-14.) Criton Technologies also manufactured a TC-885 model, but the parties agreed at oral

argument that this model was not in use at the Philadelphia International Airport.

In 1987, Criton sold Wollard Airport Equipment Company's assets and liabilities to

WAEC, an Ohio corporation and wholly owned subsidiary of defendant Hobart.[11] (Hobart Ex.

G.) WAEC agreed to assume liability for all products liability claims for occurrences after the

closing date relating to products manufactured by the seller. (*Id.* at 16.) At that time, the Criton

division was located in Florida and manufactured lavatory trucks, portable aircraft stairways, and

belt loaders. (Moler Dep. 15-16, Aug. 17, 2005.)[12]

As Hobart's subsidiary, WAEC continued to manufacture TC-886 belt loaders in Florida.

In the early 1990s, WAEC developed and produced the TC-888 model, which it sold to US

Airways starting in October 1993. (Hobart Ex. E. at 1-3.) WAEC maintained its own production

documents and materials in Florida and sold its own products. (Moler Dep. 16, 18-19.) Hobart,

on the other hand, manufactured welders, welding consumables and aircraft generators, but never

---

[11]There is no evidence that, after the acquisition, Criton Technologies ever resumed manufacturing belt loaders or that it continues to exist.

[12]The deposition testimony of Tammy Moler, a legal assistant and assistant secretary employed by Hobart, was taken by plaintiffs' counsel in a contemporaneous action involving belt loaders.

belt loaders, in two plants in Ohio.  (Moler Dep. 8-9, 12-15, 28.)

On October 21, 1994, WAEC (which changed its name to Ground Power Liquidating, Inc.)[13] sold the assets (including the WAEC name) and certain liabilities of WAEC to WAEC Inc.  (Hobart Ex. H.)  WAEC Inc. did not agree to assume liability for any products liability claims relating to products manufactured by WAEC.  (*Id.* at 3; NMC Ex. M.)  WAEC Inc. continued to manufacture TC-888 belt loaders.  (Hobart Ex. E. at 3-14)

Six years later, in 2000, WAEC Inc. merged with Northwestern Motor Company to form NMC.  (Steingart Aff. ¶ 18.)  Through the merger, NMC automatically assumed the liabilities of WAEC Inc. and Northwestern Motor Company.[14]  Thereafter, NMC continued to manufacture and sell TC-888 belt loaders to US Airways.  (Hobart Ex. E at 16-25.)

**C.      A "Wollard" Belt Loader Was Involved in Waters's Accident**

Plaintiffs' briefing identifies the belt loader as a "Wollard" belt loader.  (Pl.'s Resp. 3; *see also* NMC's Req. for Admis. 11.)  At oral argument, the parties agreed to the following undisputed circumstantial evidence of product identification.  Only "Wollard" belt loaders were used by U.S. Airways at Philadelphia International Airport.  All of "Wollard" belt loaders used by U.S. Airways at its Philadelphia location were manufactured and designed by one of the above four entities.  Moreover, all of the "Wollard" belt loaders share the same alleged defect – the absence of a second handrail and a midrail.  (*See* Poczynok Aff. ¶¶ 4-7.)[15]   Therefore, the belt

---

[13]Ground Power Liquidating, Inc. was dissolved in 1997.  (Pl.'s Ex. F.)

[14]*See Cont'l Ins. Co. v. Schneider, Inc*., 873 A.2d 1286, 1291 (Pa. 2005).

[15]Plaintiffs have attached the affidavit of Peter Poczynok, an engineering expert, to support their alternative theory of liability.  Because the summary judgment motions have been filed on the issue of product and manufacturer identification, the affidavit is not offered to create

loader used by Waters at the time of his accident was made by one of the four manufacturers cited.

## II.    Procedural History

Plaintiffs filed their complaint in the Court of Common Pleas of Philadelphia County on December 14, 2005.  On January 4, 2006, NMC filed a notice of removal to this court, and plaintiffs responded on February 2, 2006 with a motion to remand, which was denied on February 21, 2006.  Plaintiffs then filed an amended complaint on April 6, 2006, which was superseded by a revised amended complaint, filed on April 10, 2006.   NMC filed its answer with affirmative defenses and a cross-claim against Hobart on April 11, 2006.  Hobart answered the revised amended complaint and filed a cross-claim against NMC on April 24, 2006.  On February 22, 2007, both defendants moved for summary judgment.  All subsequent responses have been filed.  On May 2, 2007, Hobart filed a supplemental reply brief, joined by NMC on May 3, 2007, to alert the court to the decision of *Warnick v. NMC-Wollard, Inc.*, 2007 U.S. Dist. LEXIS 23576 (W.D. Pa. Mar. 30, 2007).  On May 17, 2007, plaintiffs responded with a supplemental filing to attach the affidavit of Peter Poczynok to support their alternative theory of liability.  On August 23, 2007, this court heard oral argument on Hobart and NMC's motions.

## III.   Standard of Review

Either party to a lawsuit may file a motion for summary judgment, and it will be granted

---

a triable issue that the belt loader was unreasonably dangerous, a distinct question not raised by the motions.  *See Parks v. AlliedSignal*, Inc., 113 F.3d 1327, 1331 (3d Cir. 1997) ("In the words of the Pennsylvania Supreme Court, 'Section 402A . . . requires only proof that a product was sold in a defective condition unreasonably dangerous to the user or consumer, *and* that the defect was the proximate cause of plaintiff's injuries.'") (quoting *Walton v. Avco Corp*., 610 A.2d 454, 458 (Pa. 1992)) (emphasis added).

only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving

party bears the initial burden of showing that there is no genuine issue of material fact. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial

burden, the nonmoving party must present "specific facts showing that there is a genuine issue

for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).

"Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists

from which a rational person could conclude that the position of the person with the burden of

proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.,* 90 F.3d 737,

743 (3d Cir. 1996) (citation omitted). The non-movant must present concrete evidence

supporting each essential element of its claim. *Celotex*, 477 U.S. at 322-23.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed." *Anderson*, 477 U.S. at 255. Furthermore, "[a]ll justifiable inferences

are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted . . . if

there is a disagreement over what inferences can be reasonably drawn from the facts even if the

facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an inference

based upon a speculation or conjecture does not create a material factual dispute sufficient to

defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d

Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of

evidence" for elements on which he bears the burden of production. *Anderson*, 477 U.S. at 252.

Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

8

non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citations

omitted).

Summary judgment is improper when a case turns on credibility determinations, *see*

*Anderson*, 477 U.S. at 255, and, as the Third Circuit has noted, on state of mind, *see Coolspring*

*Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *Riehl v. Travelers*

*Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985).

## IV.  Discussion

For claims of negligence and products liability in Pennsylvania, "plaintiff must establish

that the injuries sustained were caused by the product of a particular manufacturer or supplier."

*Payton v Pa. Sling Co.*, 710 A.2d 1221, 1225-26 (Pa. Super. Ct. 1998); *DeWeese v. Anchor*

*Hocking*, 628 A.2d 421, 423 (Pa. Super. Ct. 1993) (citing *Berkebile v. Brantly Helicopter*, 337

A.2d 893 (Pa. 1975)).[16]  If a plaintiff fails to produce evidence from which a reasonable person

could conclude that the identified product of a particular defendant was the cause of his or her

injury, then summary judgment is proper.  *Eckenrod v. GAF Corp.*, 544 A.2d 50, 52 (Pa. Super.

Ct. 1998).

Here, plaintiffs do not dispute Waters's inability to identify the belt loader at issue or its

manufacturer.  But, plaintiffs assert that under the facts and circumstances of this case, Waters's

identification problems do not doom their case.  They claim that defendants are not prejudiced by

the absence of product and manufacturer identification and that there is sufficient circumstantial

---

[16]In a diversity action, "the choice of law rules of the forum state [determine] which
state's law will be applied."  *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir. 1988)
(citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  In this case, all parties and the
court agree that Pennsylvania law is applicable.

evidence to prove identification.  (Pl.'s Resp. 8-9.)  Plaintiffs assert that corporate successor

liability and vicarious liability operate to make defendants liable for damages caused by any of

the belt loaders, regardless of when or by whom the belt loader was actually made.  (*Id*. at 13-

21.)  Alternatively, plaintiffs seek to proceed under the alternative theory liability and shift the

burden of proving causation to defendants.  (*Id.* at 9-13.)  I will discuss each theory raised by

plaintiffs' opposition to defendants' summary judgment motions in turn.

> **A.      Successor-in-Interest Liability Against NMC**

Plaintiffs claim that a basis for their recovery against NMC is its successor liability for

the conduct of the three prior entities.  They contend they have met their burden at this stage by

putting forth sufficient evidence from which a reasonable person could conclude that the belt

loader at issue was manufactured by either NMC or "one of its predecessor companies,"  (Pl.'s

Resp. 16), and that the "product line exception" is applicable to hold NMC liable as a successor

corporation.

Generally, in Pennsylvania, "when one corporation sells or transfers its assets to a second

corporation, the successor does not become liable for the debts and liabilities of the predecessor."

*LaFountain v. Webb Indus. Corp*., 951 F.2d 544, 546-47 (3d Cir. 1991).  This general rule of

non-liability can be defeated if it is shown that (1) the purchaser expressly or implicitly agreed to

assume liability, (2) the transaction amounted to a consolidation or merger, (3) the purchasing

corporation was merely a continuation of the selling corporation, (4) the transaction was

fraudulently entered into to escape liability, or (5) the transfer was without adequate

consideration and no provisions were made for creditors of the selling corporation.  *Cont'l Ins.

Co.*, 873 A.2d at 1291.  Plaintiffs seek to avoid the general rule by using a court-evolved

10

"product line exception," which provides:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 110 (Pa. Super. Ct. 1981) (quoting and adopting the standard from *Ramirez v. Amsted Indus., Inc.*, 431 A.2d 811, 825 (N.J. 1981)).  Pennsylvania courts adopted this exception in *Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106 (Pa. Super. Ct. 1981), and the Third Circuit has adopted *Dawejko* as the law of Pennsylvania.  *Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 331-32 (3d Cir. 2002).

The Third Circuit has recognized that Pennsylvania has recognized three factors as "prerequisites for the product line exception."  *Kradel*, 308 F.3d at 332.  These factors are:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being employed by the successor in the continued operation of the business.

*Hill v. Trailmobile, Inc.*, 603 A.2d 602, 606 (Pa. Super. Ct. 1992) (quoting *Dawejko*, 434 A.2d at 109 (quoting *Ray v. Alad Corp.*, 560 P.2d 3, 9 (Cal. 1977)).[17]  Additionally, the following considerations are relevant in determining whether it is just to impose liability on a successor corporation:  "whether the successor corporation advertised itself as an ongoing enterprise; or

---

[17]As the three factors that are prerequisites for the product line exception were originally articulated by the California Supreme Court in *Ray v. Alad Corp.*, 560 P.2d 3 (Cal. 1977), they are frequently referred to as the *Ray* factors.

whether it maintained the same product, name, personnel, property, and clients; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve." *Dawejko*, 434 A.2d at 111.

If the product line exception does apply in this case, NMC is potentially liable for the injuries caused by the "Wollard" belt loader used by Waters, regardless of which of the three prior entities manufactured it.  The record shows that WAEC agreed to be responsible for the liability of all of Criton's products liability claims for any incidents after the asset purchase. (Hobart Ex. G at 16.)  Moreover, through merger, NMC automatically assumed the liabilities of WAEC Inc.  *See Cont'l Ins. Co.*, 873 A.2d at 1291 (listing merger as an exception to the general rule successor non-liability).  Thus, the issue here is whether WAEC Inc. is responsible for any products liability claims lodged against WAEC.   By agreement between WAEC and WAEC Inc., the succeeding company did not expressly assume liability for any claims relating to products manufactured by its predecessor.  (Hobart Ex. H at 3; NMC Ex. M.)  However, if the product line exception is available for the transaction between WAEC and WAEC, Inc., then Waters may reach NMC for the actions of Criton, WAEC, and WAEC Inc. by virtue of successor liability and in spite of the contractual relationship between WAEC and WAEC Inc.

Plaintiffs point to the following facts in favor of invoking the product line exception. First, they urge that any remedy against WAEC has been destroyed because it no longer exists. WAEC changed its name to Ground Power Liquidating, Inc. in 1994 when it sold its assets and certain liabilities to WAEC Inc.  (Hobart Ex. H.)  Ground Power Liquidating, Inc. was then dissolved in 1997.  (Pl.'s Ex. F.)  *See Hill*, 603 A.2d at 606.  Second, under the terms of the Asset Purchase Agreement, WAEC Inc. assumed the name, products, personnel, operations, designs,

12

patents and goodwill of WAEC.  *See Dawejko*, 434 A.2d at 111.  Specifically, WAEC Inc.

purchased its predecessor company's physical and intellectual property, including: all furniture,

equipment, fixtures, machinery, vehicles, business records, customer lists, goodwill, inventory,

trade names, trademarks, patents, patent applications, technology, trade secrets, manufacturing

processes, formulae, drawings, designs, computer programs, and copyrights.  (Hobart Ex. H at 1-

2.)  WAEC Inc. also controlled the right to publicize the sale.  (*Id.* at 32.)  Further, to administer

its newly-purchased operations, WAEC Inc. also obtained the financial records, tax returns,

account payable files, payroll records, invoices, sales records, commission records, trial balance

ledgers and human resource files from WAEC.  (*Id.* at 34.)

Third, plaintiffs argue that WAEC Inc. acquired the name and good will of WAEC to

continue the same operation.  *See Dawejko*, 434 A.2d at 111.  To support of this contention,

plaintiffs state that WAEC Inc. operated its new business at the same manufacturing facility in

Florida for several months from the date of the purchase, in October 21, 1994, until spring of the

following year.  (Driver[18] Dep. 17.)  Further, WAEC Inc. manufactured the TC-888 belt loader,

which had been initially developed and sold by WAEC.  (NMC Statement of Facts No. 41.)

Additionally, WAEC Inc. continued to use the "Wollard" name on its products until 2000 when

the company merged with Northern Machinery Company to become NMC-Wollard, Inc.  (Driver

Dep. 20-21.)  Finally, in order to transfer their existing relationships to WAEC Inc., WAEC and

Hobart both agreed to introduce WAEC Inc. to their suppliers, customers, distributors and sales

representatives.  (Hobart Ex. H at 27.)

_____

[18]Peter Driver is a corporate designee for both Hobart and NMC.  His job responsibilities
have ranged from electrical and hydraulics to mechanical design.  (Driver Dep. 10.)

13

Fourth, plaintiffs claim that although the purchasing entity, WAEC Inc., did not require that WAEC immediately dissolve, it did require that WAEC abandon the belt loader business. *See Dawejko*, 434 A.2d at 111.  Upon completion of the Asset Purchase Agreement, WAEC agreed not to engage in its former business for a period of five years.  (Hobart Ex. H. at 26-27.) However, during that five-year time period, Ground Power Liquidating, Inc., once known as WAEC, dissolved.  (Pl.'s Ex. F.)

On the other hand, NMC contends that the product line exception is not applicable in this case because WAEC Inc. was not a mere continuation of WAEC.  (NMC's Br. in Supp. of Summ. J. 11.)  It states that the definitive factors in determining whether the buyer of assets is merely a continuation of the seller of assets is commonality in the identity of the officers, directors or shareholders.  (*Id.* (citing *Cont'l Ins. Co. v. Snyder, Inc.*, 810 A.2d 127, 134-35 (Pa. Super. Ct. 2002).)  NMC explains, without citation to the record, how the following evidence from the record fails to establish the requisite continuity.  When the Steingart family, who owned, managed and controlled WAEC Inc., purchased the assets of what had been WAEC, WAEC's officers, directors and shareholders all changed.  According to NMC, WAEC's Florida factory shut its operations "very shortly" after the deal closed, and within "just a few months," WAEC Inc. relocated its product manufacturing to Eau Claire, Wisconsin, where it remains to this day.  (NMC's Br. in Supp. of Summ. J. 11.)   NMC states that only a "handful" of former WAEC employees stayed with WAEC Inc. and made the move from Florida to Wisconsin.  (*Id.*)

From the available record, it is clear that there is a factual dispute as to the applicability of the product line exception, and, ultimately, NMC's potential liability; therefore, I will deny NMC's motion for summary judgment.  However, it is not immediately apparent whether the

14

disputed facts are legally relevant.  Because the issue of the product line exception has not been fully briefed, I will provide more time for both parties to further brief the exception.  The court will then decide if a decision as to the viability of the product line exception may be made as a matter of law or whether it is one appropriately submitted to a jury.

### B.    Vicarious Liability Against Hobart

Plaintiffs seek to hold Hobart responsible for Waters's injuries by arguing that Hobart is liable for products WAEC made while it was Hobart's wholly-owned subsidiary because Hobart allowed its name to be displayed on the belt loader used by Waters.  (Pl.'s Resp. 13-15 (citing Restatement (Second) Torts § 400 (1965).)   In other words, at this late stage, plaintiffs seek to impose liability on Hobart not only directly as the manufacturer of the belt loader (which it wasn't), but also vicariously under § 400.

While a parent corporation is not normally liable for the contractual obligations of its subsidiary, even if that corporation is its wholly-owned subsidiary, *Nobers v. Crucible, Inc.*, 602 F. Supp. 703, 706 (W.D. Pa. 1985) (citation omitted), § 400 may offer one vehicle by which a parent can be held responsible for the defective products manufactured by its subsidiary.  Section 400 provides that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."  § 400.  The Pennsylvania Supreme Court adopted § 400 as part of Pennsylvania tort law in *Forry v. Gulf Oil Corp.*, 237 A.2d 593 (Pa. 1968), and offered the following reasons for extending liability in such a situation: "(a) the name and the trademark of the sponsor, plus the reputation of the sponsor, constitute 'an assurance to the user of the quality of the product' and (b) 'reliance [by the user] upon a belief that [the sponsor] has required [the product] to be made properly for him.'"  237 A.2d at 599

15

(quoting § 400 cmt. d).[19]  Further, "the act of placing one's name on a product is a factor in assessing responsibility because it frequently causes a product to be used in reliance upon a seller's reputation."  *Brandimarti v. Caterpillar Tractor Co.*, 527 A.2d 134, 139 (Pa. Super. Ct. 1987).

However, plaintiffs' effort to introduce the theory of vicarious liability to save their action against Hobart cannot succeed at this stage for several reasons.  First, the theory and its reliance on § 400 is absent from the revised amended complaint, which only asserts direct and successor-in-interest liability under Restatement (Second) of Torts § 402a, negligence, and breach of warranty theories.[20]  At oral argument, plaintiffs' counsel argued that Hobart was put on notice through Paragraph 14 of the revised amended complaint that alleges Waters was injured through the conduct of the defendants or "through their agents."  (Rev. Am. Compl. ¶ 14.)  However, I find that this the phrase "through their agents" is insufficient to state a claim of vicarious liability against Hobart.  In addition, vicarious liability and personal liability are distinct causes of action, *Willinger v. Mercy Catholic Med. Ctr.*, 362 A.2d 280, 285 (Pa. Super. Ct. 1978), and this jurisdiction has previously not looked favorably upon the practice of inserting a new claim in response to a defendant's motion for summary judgment, *see Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 537-38 (E.D. Pa. 1999) (granting summary judgment where plaintiff never alleged vicarious liability in pleadings).  *See also Schaffer v. A.O. Smith*

---

[19]The *Forry* court adopted but did not apply § 400 to the facts of the case before it.  237 A.2d at 599.

[20]In their revised amended complaint, plaintiffs have only advanced the theory that Hobart is liable as a manufacturer of the belt loader, "either directly or as a successor in interest or through successor corporate liability."  (Rev. Am. Compl. ¶ 6.)

16

*Harvestore Prods., Inc.*, 74 F.3d 722, 731 (6th Cir. 1996); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990). Therefore, this newly-raised claim of vicarious liability need not be considered by this court.

Setting aside, for the moment, the above obstacle to plaintiffs' vicarious liability theory, plaintiffs' assertion is undermined by an additional flaw. Plaintiffs have put forth some evidence from which a reasonable juror might conclude that Hobart engaged in a course of conduct to put out belt loaders manufactured by its subsidiary WAEC as its own. Whether this evidence is enough to hold Hobart vicariously liable for the conduct of WAEC is a disputed issue of fact. For instance, Hobart trademarked the name "Hobart-Wollard" and listed "mobile baggage conveyers," or belt loaders, as among the products with which the trademarked name was associated. (Pl.'s Ex. M at 5.) Hobart also placed its name on the product name plate. (Pl.'s Ex. G and H; Driver Dep. 18 (stating "the name plate on the Hobart Wollard unit said Hobart Wollard").) Moreover, Hobart's corporate representative, Tammy Moler, *see supra* note 10, testified that Hobart "managed" WAEC. (Moler Dep. 16.) Further, at oral argument, plaintiffs presented copies of brochures advertising "Wollard" TC-886 and TC-888 belt loaders and containing the name "Hobart Airport Systems." However, even if this proof were to render Hobart is vicariously liable for the WAEC's actions, there is no evidence from which a reasonable jury could find that WAEC, as opposed to one of the other three manufacturers did, in fact, manufacture the belt loader used by Waters. Plaintiffs' argument presumes the belt loader involved in Waters's accident was a WAEC belt loader, but the belt loader could have been made by WAEC Inc. or NMC. Under these circumstances, a reasonable person would be unable to

17

conclude whether Hobart is vicariously liable for Waters's injuries.  Accordingly, Hobart is entitled to summary judgment on plaintiffs' products liability claims.[21]

### C.    Alternative Theory of Liability

As plaintiffs admit in their response, they cannot specifically identify which defendant's belt loader caused the injuries.  Consequently, plaintiffs urge the application of the alternate or alternative theory of liability to shift the burden of proving causation to defendants.  The general rule is that the burden of proof is on the plaintiff to show that the defendant's tortious conduct has caused the harm to the plaintiff.  Restatement (Second) of Torts § 433B(1) (1965). However, plaintiffs claim that the exception contained in subsection (3) applies.  Section 433B(3) provides:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

§ 433B(3).[22]  Under Pennsylvania law, a plaintiff asserting alternate liability must show:  (1) "each defendant's tortious conduct was simultaneous and identical" and (2) "all potential tortfeasors were joined as defendants."  *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 128 (3d Cir. 1993).  With regard to the "simultaneous" element, the Restatement clarifies

---

[21]Hobart requests that I grant summary judgment in their favor on *all* claims asserted by plaintiffs because plaintiffs cannot establish what product or manufacturer was involved.  While the bulk of its brief is devoted to plaintiffs' negligence and strict liability claims, and not the breach of warranty claim, plaintiffs have conceded that they "cannot specifically identify which defendant's product caused the injuries."  (Pl.'s Resp. 10.)  Thus, I find that plaintiffs' lack of product identification evidence also provides sufficient grounds for summary judgment in favor of Hobart on the breach of warranty claim.  *See In re Asbestos Sch. Litig.*, 1991 U.S. Dist. LEXIS 6392, at *25 (E.D. Pa. May 13, 1991) (granting summary judgment on negligence and breach of warranty claims, since plaintiffs had conceded their lack of product identification evidence).

[22]The Pennsylvania Supreme Court has adopted alternative liability as defined in § 433B(3).  *Skipworth*, 690 A.2d at 174 (citing *Snoparsky v. Baer*, 266 A.2d 707 (Pa. 1970)).

18

that cases in which the alternative theory of liability has been applied "involved conduct simultaneous in time, or substantially so, and all of them have involved conduct of substantially the same character, creating substantially the same risk of harm, on the part of each actor." § 433B(3) cmt. h.

Aside from the fact that plaintiffs have failed to plead alternate liability in the revised amended complaint, as plaintiffs agreed at oral argument, the theory is not applicable in this case. Crucially, plaintiffs have not produced any evidence that Hobart's and NMC's conduct was substantially simultaneous. Substantiality of conduct does not necessarily mean concerted conduct. "The defendants need only have acted in substantially the same manner and need not have been aware that others were also acting at about the same time." *Drayton v. Pilgrim Pride Corp.*, 472 F. Supp. 2d 638, 647 (E.D. Pa. 2006). In this case, the evidence shows that Hobart's subsidiary WAEC manufactured "Wollard" belt loaders only from 1987 to 1994, while successor belt loader companies then produced these products from 1994 to the present. But, this kind of conduct is not sufficiently "simultaneous" to permit the alternative theory of liability to shift the burden of causation to defendants. *See Warnick v. NMC-Wollard, Inc.*, 2007 U.S. Dist. LEXIS 23576, at *55 (W.D. Pa. Mar. 30, 2007). Moreover, the two defendants did not act simultaneously when Waters was injured. The conveyor belt of only one of the manufacturers was being used then – not two or four.

At oral argument, plaintiffs' counsel conceded that Hobart and NMC products may not have been introduced into the market place simultaneously. However, counsel argued that alternative theory of liability is still appropriate in this case because belt loaders are built to last for several decades, and Hobart and NMC permitted these allegedly defective and long-lasting

19

products to remain in the market place.   Thus, plaintiffs urge a more elastic definition of "simultaneous" in order to reach what they consider to be a fair result in keeping with the public policy underlying strict products liability "to protect the injured party by placing the burden on the party most able to bear the loss by spreading the risk."   *See* Restatement (Second) Torts § 402A cmt. c.  Undeniably, Waters is a sympathetic and injured party who has been placed in the unfortunate position of having to reconstruct his accident without the aid of his own memory or any eye-witnesses.   However, he was also in the best position to identify the belt loader from which he fell, especially as all "Wollard" belt loaders used by U.S. Airways at the time of his accident were emblazoned by U.S. Airways LD numbers.  (Matlack Dep. 29:10-14.)  Thus, the defendants did not put the plaintiff in the unfair position of pointing to the particular defendant that caused his harm.   The Restatement does acknowledge the possibility that in some cases, the rule contained in § 433B(3) may require "some modification" due to "the effect of lapse of time, or because of substantial differences in the character of the conduct of the actors or the risks which they have created." § 433B(3) cmt. h.   However, without any exemplary case law cited by the Restatement or by plaintiffs to support their expanded notion of alternative liability, this court is reluctant to apply the theory to these facts.   Pennsylvania courts have been strict in permitting the expansion of the theory.   *See, e.g, City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 1992 U.S. Dist. 5849, at **50-59 (E.D. Pa. Apr. 23, 1992), *aff'd*, 994 F.2d 112, 128 (3d Cir. 1993). Additionally, the following illustration provided by the Restatement to demonstrate an example of the inapplicability of the alternative theory of liability closely mirrors the factual situation of this case:

Over a period of three years A successively stores his furniture in warehouses

> operated by B, C, and D. At the end of that time A finds that his piano has been damaged by a large dent in one corner. The nature of the dent indicates that it was caused by careless handling on a single occasion. A has the burden of proving whether the dent was caused by the negligence of B, C, or D.

§433B(3) cmt. h., illus. 10.  Just as in this case, the warehouse operators acted in sequence, not simultaneously; therefore, the alternative theory of liability does not apply.

Finally, plaintiffs claim that the affidavit of their expert is sufficient to support the viability of alternate liability in this case.  According to Poczynok, a professional engineer, both the TC-886 and TC-888 models were defective because it was technically and economically feasible to have more handrails.  (Poczynok Aff. ¶¶ 4-7.)  However, this affidavit cannot overcome the obvious fact that Waters used only one belt loader made by one manufacturer on the day of his accident.  One court has opined that "outside of the mass-tort context, alternative liability theory does not allow a plaintiff to sue a manufacturer to whose product plaintiff has not been exposed based on the fortuitous discovery that the product shares a common defect with other products of the same type."  *Kinnett v. Mass. Gas & Elec. Supply Co.*, 716 F. Supp. 695, 700 (D.N.H. 1989).  Thus, plaintiffs cannot avail themselves of the alternate liability theory.

In sum, the application of the theory of alternative liability is not appropriate in this case because the theory was not pleaded in the revised amended complaint and plaintiffs have failed to raise a genuine issue of material fact that Hobart and NMC acted simultaneously.

### E.  Loss of Consortium

Under Pennsylvania law, in order to recover on a loss of consortium claim, a party must show that a defendant is liable to his or her spouse.  *See Szydlowski v. City of Philadelphia*, 134 F. Supp. 2d 636, 639 (E.D. Pa. 2001).  Mrs. Waters's loss of consortium allegations are wholly

derivative of her husband's substantive allegations.  Thus, because Hobart is entitled to summary judgment as to Waters's claims, the court will also grant Hobart's motion for summary judgment as to Mrs. Waters's loss of consortium claim. However, the court denies NMC's motion for summary judgment as to Mrs. Waters's loss of consortium claim.

**V.      Conclusion**

For the reasons discussed above, plaintiffs' claims against Hobart fail as a matter of law, and Hobart is entitled to summary judgment against plaintiffs.  NMC's motion for summary judgment will be denied.

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALBERT WATERS and                          :              CIVIL ACTION
LISA WATERS,                               :
Plaintiffs,                                :              NO. 06-0032
                                           :
            v.                             :
                                           :
NMC-WOLLARD, INC. and                      :
HOBART BROTHERS COMPANY,                    :
Defendants.

YOHN, J.

## Order

    **AND NOW**, this _____ day of September, 2007, upon consideration of defendant Hobart Brothers Company's motion for summary judgment (Doc. No. 46) and accompanying statement of facts, defendant NMC-Wollard, Inc.'s motion for summary judgment (Doc. No. 47) and accompanying statement of facts, as well as plaintiffs Albert and Lisa Waters's response, and the parties' various replies and after oral argument, it is hereby **ORDERED** that:

I.      Pursuant to an agreement of counsel, defendants Wollard Airport Equipment, Inc.; Wollard Equipment Co., Inc.; Northwestern Motor Co., Inc.; Northwestern Motor Co., Inc., Division of Mobility, Inc.; Steingart Acquisition Co., Inc.; Criton Technologies; Wollard Airport Equipment Company; and Ground Power Liquidating, Inc. are **DISMISSED** as parties in the instant action.

II      Defendant Hobart Brothers Company's motion for summary judgement is **GRANTED**.

III.      Defendant NMC Wollard Inc.'s motion for summary judgment is **DENIED**.

IV.     Judgment is **ENTERED** in favor of defendant Hobart Brothers Company and

against plaintiffs Albert and Lisa Waters.

V.      Plaintiff shall file a supplemental brief within fourteen days of the date of this

order, not to exceed fifteen pages, setting forth the undisputed facts and the

disputed facts which are legally relevant (with citations to the record) and legal

argument with reference to whether the product line exception applies to the

transaction between WAEC (renamed Ground Power Liquidating, Inc.) and

WAEC, Inc.

VI.     NMC Wollard, Inc. shall file a responsive brief, not to exceed fifteen pages,

with reference to the same issues, within fourteen days of the receipt of plaintiffs'

brief.


                                                  s/William H. Yohn Jr._____
                                                  William H. Yohn Jr., Judge