# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALBERT WATERS and : | |
| LISA WATERS, : | CIVIL ACTION |
| Plaintiffs, : | |
| : | NO. 06-0032 |
| v. : | |
| : | |
| NMC-WOLLARD, INC. : | |
| Defendant. : | |

**Memorandum and Order**

YOHN, J.                                                                                     January ___, 2008

Plaintiff Albert Waters brought this action alleging products liability based on a defective design, as well as other claims, against NMC-Wollard, Inc. ("NMC").[1] His claim arose out of an accident that occurred while he was operating a belt loader in the course of his employment as a baggage handler at Philadelphia International Airport. Waters's wife, Lisa, has filed a loss of consortium claim. By order dated September 5, 2007, this court denied NMC's motion and ordered plaintiffs and NMC to brief the question whether Pennsylvania's product line exception to the rule of successor non-liability applies to the asset sale between two of NMC's predecessor corporations. As explained in the memorandum accompanying that order, "[i]f the product line exception does apply in this case, NMC is potentially liable for the injuries caused by the

---

[1] The revised amended complaint also named as defendants Hobart Brothers Company ("Hobart"); Wollard Airport Equipment, Inc.; Wollard Equipment Co., Inc.; Northwestern Motor Co., Inc.; Northwestern Motor Co., Inc., Division of Mobility, Inc.; Steingart Acquisition Co., Inc.; Criton Technologies; Wollard Airport Equipment Co.; and Ground Power Liquidating, Inc. Counsel stipulated that the only proper defendants in this case were Hobart and NMC. Hobart was granted summary judgment pursuant to my order dated September 5, 2007, leaving NMC as the only remaining defendant.

'Wollard' belt loader used by Waters, regardless of which of the three prior entities manufactured it." *Waters v. NMC-Wollard, Inc.*, No. 06-0032, 2007 WL 2668008, at *6 (E.D. Pa. Sept. 5, 2007). Plaintiffs and NMC have both moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the issue of the product line exception's applicability. For the reasons explained below, I will grant plaintiffs' motion and deny NMC's motion.

I.      **Factual and Procedural Background**

The factual background of plaintiffs' claims is detailed in the memorandum accompanying this court's order denying NMC's original summary judgment motion. *See id.* Here, I review the relationship between the entities that manufactured TC-886 and TC-888 Wollard belt loaders, which were the only belt loaders used by Albert Waters's employer, U.S. Airways, at the Philadelphia airport. Four corporations have manufactured these two models of Wollard belt loaders, meaning that four corporation are potentially liable for plaintiffs' injuries if the Wollard belt loader design is determined to be defective. The parties appear to agree on all material facts.[2]

Criton Technologies ("Criton") manufactured and sold TC-886 belt loaders from 1983 until 1987, through its division Wollard Airport Equipment Company. (NMC's Mem. in Support of Mot. for Summ. J. Ex. D, K. Steingart Aff. ¶ 8.) In 1987, Criton sold Wollard Airport Equipment Company's assets and liabilities to WAEC, a separate corporation but wholly owned subsidiary of Hobart. (*Id.* at ¶ 9; *id.* Ex. 3.) Thus, WAEC was the second corporation to

---

[2] Plaintiffs, the non-movants with respect to the original motion for partial summary judgment, have noted that the applicability of the product line exception is a matter of law for the court to decide. (Pls.' Supplemental Mem. Regarding the Product Line Exception 2.)

manufacture and sell Wollard belt loaders.  WAEC agreed to assume liability for all product liability claims relating to equipment manufactured by Criton and arising after the closing date. (*Id.* Ex. 3, art. 6.)  There is no evidence that, after the acquisition, Criton ever resumed manufacturing belt loaders.  There is also no evidence that Criton continues to exist.  As Hobart's subsidiary, WAEC continued to manufacture TC-886 belt loaders (Hobart's Mem. in Supp. of Mot. for Summ. J. Ex. F, Moler Dep. 17:10-18:6, Aug. 17, 2005), and in the early 1990s WAEC developed and produced the TC-888 model (NMC's Mem. Ex. D, K. Steingart Aff. ¶¶ 13-14). Aside from through its subsidiary WAEC, Hobart never manufactured belt loaders.  (Hobart's Mem. Ex. F, Moler Dep. 8:9-11, 9:3-7, 16:4-7, 28:8-29:13.)  In 1996, ITW acquired Hobart, becoming Hobart's parent corporation.  (*See* NMC's Supplemental Mem. Concerning the Product Line Exception Ex. D; Hobart's Mem. Ex. F, Moler Dep. 30:7-9.)

In 1994, before ITW's purchase of Hobart, WAEC sold substantially all of its assets (including the WAEC name) and certain of its liabilities to WAEC, Inc. pursuant to an asset purchase agreement ("APA") to which Hobart was also a party.  (*See generally* Pls.' Supplemental Mem. Ex. F ("APA").)  WAEC, Inc., the third manufacturer of Wollard belt loaders, did not agree to assume liability for any product liability claims relating to products manufactured by WAEC.  (NMC's Mem. Ex. M.)  Meanwhile, WAEC changed its name to Ground Power Liquidating, Inc. ("GPL") (Pls.' Mem. Ex. E), and GPL dissolved in 1997 (Pls.' Mem. Ex. F).

In 2000, WAEC, Inc. (having been renamed NMC-Wollard, Inc.) merged with Northwestern Motor Company, Inc. (Pls.' Supplemental Mem. Ex. C.)  The resulting corporation is defendant NMC, which is the fourth manufacturer of Wollard belt loaders.  Kevin

Steingart is NMC's CEO.  Through the merger, NMC automatically assumed the liabilities of WAEC, Inc. and Northwestern Motor Company.  *See Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005).

On June 1, 2004, Albert Waters was walking up the raised conveyor belt of a TC-886 or TC-888 Wollard belt loader when he slipped, fell, and was injured.  (Pls.' Mem. in Opp'n to Defs.' Mots. for Summ. J. Ex. A, Waters Dep. 60:18-24, 74:4-12.)  He now seeks damages from NMC as either the manufacturer of the allegedly defective belt loader or as the successor to the liabilities of one of the other three potential manufacturers.  (*See* Compl. ¶ 2.)  Plaintiffs have admitted, however, that they cannot identify the manufacturer of the belt loader from which Albert Waters fell.  (*See* NMC's Mem. Ex. G, Pls.' Resp. to NMC's Req. for Admis. ¶¶ 11-14; Hobart's Mem. Ex. D, Waters Dep. 108:13-16.)  Therefore, to avoid summary judgment plaintiffs must link all the manufacturers of Wollard belt loaders in a chain of successor liability ending with defendant NMC.  The missing link, which the product line exception would provide, is between WAEC and WAEC, Inc.

**II.      Standard of Review**

A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the non-moving party must present

"specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir. 1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)). The non-movant must present concrete evidence supporting each essential element of his claim. *Celotex*, 477 U.S. at 322-23. Where, as here, the parties have filed cross-motions for summary judgment, "Rule 56(c) does not mean that the case will necessarily be resolved at the summary judgment stage. . . . Each party must still establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Atl. Used Auto Parts v. City of Phila.*, 957 F. Supp. 622, 626 (E.D. Pa. 1997).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. But, if no factual issues exist and the only issues before the court are legal, then summary judgment is appropriate. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir. 1995).

### III. Discussion

Generally, in Pennsylvania, "when one corporation sells or transfers its assets to a second corporation, the successor does not become liable for the debts and liabilities of its predecessor." *LaFountain v. Webb Indus. Corp.*, 951 F.2d 544, 546-47 (3d Cir. 1991). This general rule of non-liability can be defeated in several circumstances, one being when the "product line exception" applies. *See Cont'l Ins. Co.*, 873 A.2d at 1291. This exception is based on Pennsylvania courts' preference that "liability remain[] with the entity still deriving income from manufacturing the product line from which the injury arose" and that "the risk of injury . . . be spread over the purchasers of units within that product line." *Morales v. Crompton & Knowles Corp.*, 888 F. Supp. 682, 687-88 (E.D. Pa.. 1995). The "paramount policy to be promoted by [the product line exception] is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." *Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 109 (Pa. Super. Ct. 1981) (quoting *Price v. Shell Oil Co.*, 466 P.2d 722, 725 (Cal. 1970)). Thus, the exception deals with a plaintiff's remedies against a manufacturer and not with the remedies of one manufacturer against another. The exception applies when (1) the two elements of the test enunciated in *Dawejko* are met, and (2) the prerequisites first announced in *Ray v. Alad Corp.*, 560 P.2d 3 (Cal. 1977), are satisfied.

### A. The *Dawejko* Test

Pennsylvania courts adopted the product line exception in *Dawejko*, 434 A.2d 106. *See also Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 331-32 (3d Cir. 2002) (assuming *Dawejko* represents Pennsylvania law). The product line exception provides:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko*, 434 A.2d at 110 (quoting and adopting the standard from *Ramirez v. Amsted Indus., Inc.*, 431 A.2d 811, 825 (N.J. 1981)).

The two elements set out in *Dawejko* are met in this case. First, WAEC, Inc. acquired "all or substantially all the manufacturing assets of" WAEC. The APA recited that "[t]he parties mutually desire that Seller shall sell to Purchaser *substantially all of the assets*, other than the real [e]state, upon the terms and subject to the conditions set forth in this Agreement." (APA ¶ C (emphasis added).) The purchased assets included "[a]ll furniture, equipment, machinery, tooling, and trade fixtures"; "[a]ll vehicles"; "[a]ll intangible personal property, business records, customer lists and goodwill"; "[a]ll notes receivable, rights to payment and accounts receivable"; "[a]ll inventory, including raw materials, supplies, work in process and finished inventory"; "[a]ll transferable permits, licensing approvals and notifications"; and contractual rights. (*Id.* ¶ 1.1.)

Second, WAEC, Inc. undertook essentially the same manufacturing operation as WAEC: the manufacture and sale of Wollard belt loaders. (Pls.' Supplemental Mem. Ex. A, D. Steingart Dep. 46:13-23, June 7, 2005.) Therefore, the *Dawejko* test is met, and the product line exception will apply if the *Ray* prerequisites are present.[3]

---

[3] NMC's supplemental brief argues only that the *Ray* prerequisites are not met. It does not argue that the *Dawejko* test is not met. (*See* NMC's Supplemental Mem. 12-15.) Therefore, I assume NMC concedes that WAEC, Inc. acquired substantially all of WAEC's assets and undertook essentially the same manufacturing operation.

B.   **The *Ray* Prerequisites**

The Third Circuit has concluded that Pennsylvania law recognizes the three factors first announced by the California Supreme Court in *Ray* as "prerequisites for the product line exception." *Kradel*, 308 F.3d at 332. These prerequisites are:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading r[o]le, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being employed by the successor in the continued operation of the business.

*Hill v. Trailmobile, Inc.*, 603 A.2d 602, 606 (Pa. Super. Ct. 1992). As explained below, I conclude that all three prerequisites are met.

1.   **Virtual Destruction of Remedies Against Original Manufacturer**

Before the product line exception will apply, plaintiffs must show the virtual destruction of their remedies against the original manufacturer[4] and that the destruction was caused by the successor's acquisition of the business. The "virtual destruction" of remedies against the original manufacturer is not found where "the claimant had a potential remedy against the original manufacturer, but failed to exercise all available means to assert his or her claim." *Conway v. White Trucks*, 885 F.2d 95 (3d Cir. 1989); *see also LaFountain v. Webb Indus. Corp.*, 951 F.2d 544, 548 (3d Cir. 1991) ("The district court correctly decided that in accordance with *Conway*,

---

[4] Throughout, I assume where necessary that the original manufacturer of the belt loader at issue was WAEC. Because NMC assumed the liabilities of WAEC, Inc. by operation of law, NMC would be liable if the belt loader belonged to either of those two firms. Because WAEC assumed the liabilities of Criton, WAEC would be liable if either it or Criton manufactured the belt loader. Therefore, the break in the chain is between WAEC and WAEC, Inc., and the only manufacturer relevant to the application of the product line exception is WAEC.

8

the existence of a potential remedy against the actual manufacturer destroys the basis for invoking the product line exception.").

Plaintiffs argue that WAEC, Inc.'s acquisition of WAEC caused the virtual destruction of plaintiffs' remedies because, after the asset purchase, WAEC was an empty shell with no activity. (*See* Pls.' Supplemental Mem. Ex. H, Moler Dep. 21:23-22:7, May 1, 2006.) NMC argues, on the other hand, that WAEC, Inc.'s acquisition of WAEC did not cause the virtual destruction of plaintiffs' remedies because Hobart agreed to indemnify WAEC, Inc. and be the guarantor for WAEC.[5] According to NMC, "Hobart and ITW are two . . . viable entities from which [p]laintiffs could have potentially sought redress for Mr. Waters' injuries." (NMC's Supplemental Mem. 14.) Thus, the relationship between WAEC, Hobart, and ITW must be examined. I note at the outset that NMC seems to conflate WAEC, Hobart, and ITW. Importantly, each was a separate corporate entity. WAEC was the "original manufacturer"; Hobart and ITW were not.

The first question is whether the presence of an indemnification and guarantee agreement

---

[5] Specifically, NMC argues: "Hobart agreed to step in [WAEC's] shoes as if it were [WAEC.] This is part of the APA and is corroborated by the course and conduct of Hobart's parent corporation, ITW, accepting product claims from NMC. Hobart and ITW realized it should be responsible for products manufactured prior to the APA, given their financial ability to spread the risk of loss." (NMC's Supplemental Mem. 13.) NMC does not point to the relevant portions of the APA or the record in support of these assertions; nevertheless, in its statement of facts, NMC was more precise about its point:
> After the APA, [WAEC, Inc.] turned over all product liability claims to James Wooten at [ITW] . . . . NMC was never asked to participate, defend or pay any costs for claims involving belt loaders manufacturer prior to the APA. . . . NMC followed this procedure because it was not reponsible for [WAEC's] products and Hobart was the guarantor for [WAEC] under the APA.

(*Id.* at 6 (citing K. Steingart Dep. 10, 11, 13, 14, 223, 229).) (I note that pages 223 and 229 of Kevin Steingart's deposition are not in the record.)

between WAEC, Inc. and Hobart means that plaintiffs have a potential remedy against WAEC. If plaintiffs have a potential remedy against WAEC, the product line exception will not apply. Prior cases applying Pennsylvania law suggest that a potential remedy sufficient to defeat application of the product line exception exists when the original manufacturer's parent corporation has expressly *assumed the liabilities* of the original manufacturer, therefore standing in its shoes for purposes of product liability claims.  See *Hill v. Trailmobile*, 603 A.2d at 608.[6]

Pursuant to the APA, Hobart *indemnified* WAEC, Inc., but did not expressly assume WAEC's liabilities.[7]  (*See* APA ¶ 10.1(a).)  Specifically, Hobart agreed to:

> indemnify and hold [WAEC, Inc.] harmless at all times from and after the date of this Agreement, against and in respect of all damages, losses, costs and expenses

---

[6] In *Hill*, the court was presented with the following corporate succession scenario: Central Hydraulic Co. was the original manufacturer of an allegedly defective power gear in a hydraulic lift. *Id.* at 604. W.T. Young & Co. was the parent corporation of Central Hydraulic. *Id.* Central Hydraulic was purchased by Milwaukee Cylinder. *Id.* Pursuant to the sale agreement, W.T. Young expressly assumed all the liabilities of Central Hydraulic. *Id.* at 608. At the time of the suit, Central Hydraulic was defunct. *Id.* at 604. The court concluded that "Milwaukee Cylinder's purchase of Central Hydraulic did *not* virtually destroy the plaintiff's remedies against the original manufacturer" because of the parent corporation's assumption of its subsidiary's liabilities. *Id.* at 608.

In *Hill*, the Superior Court did not treat the *Ray* factors as prerequisites. The court concluded that Milwaukee Cylinder was a product line successor to Central Hydraulic, notwithstanding the potential remedy against the original manufacturer. *See id.* at 607-08. The Third Circuit, whose law this court is bound to follow, has held that the Pennsylvania Supreme Court, "if it were to adopt the product line exception, would require the virtual destruction of the plaintiff's remedies against the original manufacturer." *Conway*, 885 F.2d at 97.

[7] The meaning of this indemnity agreement is a matter of law. Under Pennsylvania law, "[i]ndemnity agreements are to be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract. In interpreting the scope of an indemnification clause, the court must consider the four corners of the document and its surrounding circumstances." *Chester Upland Sch. Dist. v. Edward J. Meloney, Inc.*, 901 A.2d 1055, 1059 (Pa. Super. Ct. 2006) (internal citations omitted). "Pennsylvania courts require that an indemnity agreement be strictly construed against the party asserting it." *Kiewit E. Co. v. L & R. Constr. Co.*, 44 F.3d 1194, 1202 (3d Cir. 1995).  Therefore, I will interpret the indemnity provision in the APA narrowly.

> (including reasonable attorneys' fees) which [WAEC, Inc.] may suffer or incur in connection with . . . [a]ny claim, demand, action or proceeding . . . asserted by any person respecting any liabilities of [WAEC] which are not expressly assumed by [WAEC, Inc.] under this Agreement.

(*Id.*)  In the guarantee provision, Hobart agreed to:

> absolutely and unconditionally guarantee[] the full payment and performance when due of each and every obligation, duty and liability of [WAEC] described in this Agreement, and all documents and matters referenced in this Agreement as if said obligations, duties and liabilities were the direct responsibility of Hobart.  This guarantee is a primary obligation of Hobart, and [WAEC, Inc.] shall not be required to first resort to [WAEC] for satisfaction or any other person or entity or other rights or remedies whatsoever.

(*Id.* ¶ 11.12(d).)

The plain language of the indemnification provision suggests that Hobart intended to indemnify WAEC, Inc. for payments made pursuant to product liability claims.  Following the plain language of the indemnification provision, because WAEC, Inc. did not expressly assume products liability claims under the APA,[8] Hobart apparently intended to indemnify and hold harmless WAEC, Inc. with respect to WAEC's product liability claims.  However, the clause speaks only to expenses that WAEC, Inc. may *suffer or incur*.  The clause does not address claims for injuries caused by equipment manufactured by WAEC that do not lead to actual liabilities of WAEC, Inc.  Until WAEC, Inc. incurs damages, losses, costs, or expenses, the clause does not come into play.  The guarantee provision adds, simply, that Hobart will fulfill its duties under the APA (including the duty to indemnify WAEC, Inc.) without WAEC, Inc. first having to seek a remedy from WAEC.  Thus, the provisions provide contractual, but not tort, remedies.  Given Pennsylvania law's requirement that indemnification provisions be interpreted

---

[8] The liabilities WAEC, Inc. assumed are listed in Exhibit 1.3 of the APA.  (*See* NMC's Mem. Ex. M.)  The list does not include product liability claims.

11

narrowly, *see supra* note 17, I cannot conclude that the APA provisions, by their terms, create a potential remedy against "the original manufacturer," i.e., WAEC, through its parent corporation, as required by the product line exception. This is not a situation analogous to the express assumption of liabilities in *Hill*.

The second question to be answered concerns the relationship between WAEC and ITW. NMC asserts that a potential remedy sufficient to defeat application of the product line exception is available against ITW, Hobart's parent corporation. NMC argues: "It is [ITW] which indemnifies NMC for personal injury claims associated with WAEC's products."[9] (NMC's Mem. 9.) NMC has provided evidence, in the form of deposition testimony of NMC's CEO, of ITW's practice of defending suits relating to WAEC-manufactured equipment. NMC apparently forwarded to ITW civil actions that involved equipment manufactured before WAEC, Inc. acquired the "Wollard" product line from WAEC.[10] NMC has offered no evidence of a legal

---

[9] Nothing in the record suggests that ITW was a party to the APA between WAEC and WAEC, Inc. Indeed, the APA was signed in 1994, and ITW did not become Hobart's parent corporation until 1996. (*See* NMC's Supplemental Mem. Ex. D.) There is no evidence before me of a separate indemnification agreement between ITW and NMC.

[10] The CEO of NMC testified:
> Q. How was it that NMC-Wollard would contact [Hobart's] parent corporation to defend a lawsuit that did not name Hobart . . . or [WAEC], or [GPL]?
> A. Once we determined when the product in question was manufactured, that it was manufactured before we purchased the assets, then we would send that case to [ITW]. That was their responsibility.
> Q. . . . [H]ow would it be their responsibility if they were not named as a party?
> A. Because in the asset purchase agreement we did not assume any of those liabilities . . . . The understanding was any product made prior to our ownership stayed with Hobart.
> Q. You mean responsibility, if any?
> A. Right.

(NMC's Supplemental Mem. Ex. C, K. Steingart Dep. 13:7-14:18, May 1, 2006; *see also* Hobart

obligation on the part of ITW to defend these suits.[11]

Even if NMC's claims about Hobart's and ITW's relationship to WAEC and WAEC, Inc. are true, plaintiffs with product liability claims relating to WAEC-manufactured equipment do not have a potential remedy against *the original manufacturer*. First, given the paucity of evidence regarding Hobart's and ITW's legal responsibilities with respect to product liability claims involving WAEC-manufactured equipment, I cannot conclude that either entity has a legal responsibility to stand in the shoes of WAEC and defend these suits. The obligation is to indemnify WAEC, Inc., and indemnification is not a matter before me. Second, ITW has never been a manufacturer or the parent company of a manufacturer of Wollard belt loaders. Finding that a potential remedy against the original manufacturer exists because of ITW's practice of defending suits involving WAEC-manufactured equipment would contravene the product line exception's raison d'etre—keeping liability for defective products with the manufacturers of the product line, who can spread the risk among consumers of the product line. On the record before me, according to which ITW acquired Hobart in 1996 (over a year after Hobart sold WAEC), ITW has never had any relationship with the Wollard belt loader product line. *Cf. Morales*, 888 F. Supp. at 687-88 (declining to apply the product line exception to an "intermediate successor" that, at the time of the suit no longer had any connection to the product line, because of the

---

Mem. Ex. F, Moler Dep. 21:12-16 (noting that after 1996, lawsuits dealing with WAEC-manufactureed equipment "received" by Hobart were "administered" by ITW).) Kevin Steingart testified that the defense of product liability lawsuits were not subject to the APA because "[i]t wasn't part of the negotiation." (Pls.' Supplemental Mem. Ex. B, K. Steingart/Driver Dep. 84:24-85:7, July 27, 2005.)

[11] I presume that ITW, as the parent corporation of Hobart, defends these suits because of ITW's potential liability, based on contract principles, arising out of indemnification agreements between the corporations.

exception's purpose of "keeping successor liability with the product line"). The product line exception deals with plaintiff's potential remedy against WAEC and not with NMC's potential remedies against WAEC, Hobart, or ITW. Plaintiff's remedies against WAEC have been destroyed.[12]

Finally, the causation element inherent in the destruction-of-remedies prerequisite is satisfied. The "virtual destruction of [plaintiffs'] remedies" must have been caused by "the successor's acquisition of the business." *Dawejko*, 434 A.2d at 110; *see also Conway*, 885 F.2d 90 (citing and explaining cases). Here, there is no dispute that WAEC's sale of substantially all its assets caused WAEC ultimately to dissolve in 1997. WAEC was not only an empty shell after the asset sale; it was an empty shell that was prohibited from engaging in the business in which it had engaged prior to the asset sale. (*See* APA ¶ 8.2.) After the asset sale, WAEC could not function as a going concern, and thus the asset sale destroyed the potential for tort remedies against WAEC. Therefore, the first prerequisite is satisfied.

### 2. Risk Spreading

Before the product line exception will apply, the second and third prerequisites also must be met. The second prerequisite requires that the successor corporation have the ability to assume the original manufacturer's risk-spreading role. WAEC, Inc. was—and NMC now is—able to adopt WAEC's risk spreading role. The asset sale through which WAEC, Inc. acquired WAEC's name and assets "had the . . . effect of transferring to [the purchasing

---

[12] This does not mean that NMC cannot pursue remedies pursuant to the APA's indemnity clause or any other agreement it may have with Hobart or ITW if plaintiff is successful at trial.

corporation] the resources that had previously been available to [the selling corporation] for meeting its responsibilities to persons injured by defects in [its products]." *See Ray*, 560 P.2d at 9. As the *Ray* court explained, "[t]hese resources included not only the physical plant, the manufacturing equipment, and the inventories of raw material, work in process, and finished goods, but also the know-how available" to the successor company. *Id.* There is no dispute that WAEC, Inc. could "pass[] on to purchasers of new . . . products [in the product line] the costs of meeting these risks." *See id.* WAEC, Inc. was therefore able to adopt the risk-spreading role of WAEC, its predecessor.

Furthermore, NMC, the successor by operation of law to WAEC, Inc.'s liabilities, *see Cont'l Ins. Co.*, 873 A.2d at 1291, is a going concern manufacturing Wollard belt loaders. (Pls.' Supplemental Mem. Ex. A, D. Steingart Dep. 31:17-19; Pl's Supplemental Mem. Ex. B, K. Steingart/Driver Dep. 79:14-16; Pls.' Supplemental Mem. Ex. I.) NMC therefore is able to adopt the predecessor corporations' risk-spreading roles. *See Hill*, 603 A.2d at 608.

### 3. Fairness

The third *Ray* prerequisite provides that fairness must allow requiring the successor corporation to assume the burden of accepting responsibility for the original manufacturer's defective products. Requiring NMC to assume responsibility for defective products manufactured by the predecessor corporations is fair because requiring WAEC, Inc. to assume responsibility for products manufactured by WAEC would have been fair, and NMC acquired WAEC Inc.'s liabilities by operation of law. A court must consider, "[i]n any particular case[,] . . . whether it is just to impose liability on the successor corporation." *Dawejko*, 434 A.2d at 111.

The following considerations are relevant in determining whether it is just to impose liability on a successor corporation: "whether the successor corporation advertised itself as an ongoing enterprise; or whether it maintained the same product, name, personnel, property, and clients; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve."[13]  *Dawejko*, 434 A.2d at 111 (internal citations omitted).

When WAEC, Inc. acquired WAEC, the successor corporation continued its predecessor's business of manufacturing Wollard belt loaders.  (Pls.' Supplemental Mem. Ex. B, K. Steingart/Driver Dep. 84:16-22 ().  The logo on the belt loader apparently was not changed.  (*Id.* at 100:12-17.)  WAEC, Inc. received WAEC's customer lists (APA ¶ 1.1(c)); Hobart agreed to use its best efforts to introduce WAEC, Inc. to suppliers, customers, distributors, and sales representatives (*id.* ¶ 8.4); and Hobart agreed to use its best efforts to transfer the relationships between WAEC and those parties to WAEC, Inc. (*id.*).  WAEC, Inc. also continued production with the same employees.  (Pls.' Mem. Ex. N, Driver Dep. 17:23-18:1, Apr. 27, 2006.)  Furthermore, WAEC agreed to use its best efforts to keep current employees with WAEC, Inc. (APA ¶¶ 5.2(a)(f), 6.1(m)), and WAEC, Inc. agreed to reach agreements of continued employment with certain individuals (*id.* ¶ 6.2(k)).  Given these agreements, together with the WAEC, Inc.'s maintenance of the "Wollard" name[14] (Pls.' Mem. Ex. N, Driver Dep. 20:15-21:6),

---

[13] I agree with plaintiffs that the commonality of officers, directors, or shareholders is not relevant to application of the product line exception.  Instead, these factors are relevant to the "continuation" exception and the "de facto merger" exception to the rule of successor non-liability.  *See generally* George W. Kuney, *Successor Liability in Pennsylvania*, 78 Pa. Bar Ass'n Q. 160, 161-64 (2007) (explaining the elements of the exceptions).

[14] Plaintiff asserted in its original response to defendants' motion for summary judgment: the seller was required to produce evidence of its change of name from [WAEC] to [GPL], so that the new company could use the "Wollard" name. . . . [WAEC, Inc.]

and WAEC, Inc.'s express purchase of WAEC's goodwill (APA ¶ 1.1(c)), it is clear that WAEC, Inc. portrayed itself as an ongoing enterprise.[15]

WAEC, Inc. did not specifically require WAEC to dissolve, but the APA included a non-compete provision, preventing WAEC from "engag[ing] in any business in which [WAEC] is presently engaged or in which [WAEC, Inc.] engages in prior to the termination of this covenant not to compete." (APA ¶ 8.2.) WAEC also agreed not to "solicit the services of any employee or agent of the Business for a period of five . . . consecutive years." (*Id.*) After the sale, Hobart (WAEC's parent corporation) did not manufacture belt loaders. (Pls.' Supplemental Mem. Ex. B, K. Steingart/Driver Dep. 99:12-14; Hobart's Mem. Ex. F, Moler Dep. 53:4-7.)

In sum, the "deliberate albeit legitimate exploitation of [WAEC's] established reputation as a going concern manufacturing a specific product line gave [WAEC, Inc.] a substantial benefit which its predecessor could not have enjoyed without the burden of potential liability for injuries from previously manufactured units." *Ray*, 560 P.2d at 10-11. Therefore, fairness permits

---

was chosen as the name of the purchasing company because it was identical ([albeit] with the addition of "Inc.") to the seller's name and would be recognized in the market).
(Pls.' Mem. 19 (citing APA ¶ 7.2(n)).)

[15] Also relevant is NMC's continued practice of issuing product identification bulletins to all purchasers, regardless of the manufacturer of the equipment. (*See* Pls.' Supplemental Mem. Ex. B, K. Steingart/Driver Dep. 101:14-103:4), and NMC's practice of handling warranty claims on units manufactured by WAEC. (*See id.* at 100:4-10; *but see* NMC's Supplemental Mem. Ex. A, K. Steingart Aff. ¶ 8, Oct. 9, 2007 ("At no time after the APA did NMC provide warranty service for TC-886 belt loaders.").)
Finally, WAEC, Inc. did not conduct a safety review after its purchase of WAEC's assets. WAEC, Inc. chose to rely on the assessment of Driver, the WAEC engineer who continued to work for WAEC, Inc., that the product was safe. (*See* Pl.'s Supplemental Mem. Ex. D, Driver Dep.23:19-24:17, Apr. 27, 2006; Pl.'s Supplemental Mem. Ex. B, K. Steingart/Driver Dep. 237:16-238:20.)

requiring WAEC, Inc. and, successively, NMC, to assume responsibility for the predecessor corporations' defective belt loaders.

**III.     Conclusion**

There are no disputed facts relevant to the parties' motions for partial summary judgment. Because the *Dawejko* test and the *Ray* prerequisites are satisfied, the product line exception applies. All four manufacturers of Wollard belt loaders are linked by successor liability—WAEC expressly assumed the liabilities of Criton; the product line exception permits recovery against WAEC, Inc. as successor to WAEC; and NMC assumed the liabilities of WAEC, Inc. NMC, as the current producer of Wollard belt loaders, is potentially liable for defective products manufactured by any of the three predecessor corporations. Therefore, on the issue of the applicability of the product line exception, NMC's motion for summary judgment will be denied and plaintiffs' motion for summary judgment will be granted.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALBERT WATERS and : | |
| LISA WATERS, : | CIVIL ACTION |
| Plaintiffs, : | |
| : | NO. 06-0032 |
| v. : | |
| : | |
| NMC-WOLLARD, INC. and : | |
| HOBART BROTHERS COMPANY, : | |
| Defendants. | |

YOHN, J.

## Order

AND NOW, this _____ day of January 2008, upon consideration of defendant NMC-Wollard, Inc.'s motion for partial summary judgment (Docket No. 47), plaintiffs' motion for partial summary judgment (Docket No. 62), and the parties' accompanying memoranda and exhibits, it is hereby ORDERED that NMC-Wollard, Inc.'s motion for partial summary judgment is DENIED and plaintiffs' motion for partial summary judgment is GRANTED.

IT IS FURTHER ORDERED that trial is scheduled for March 31, 2008, at 10:00 a.m.

                                                    __s/ William H. Yohn Jr._____
                                                    William H. Yohn Jr., Judge