# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALBERT WATERS and
LISA WATERS,
      Plaintiffs,

      v.

NMC-WOLLARD, INC.,
      Defendant.

:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

NO. 06-0032

## Memorandum and Order

YOHN, J.                                                     January _6_, 2009

Plaintiffs Albert and Lisa Waters filed this products liability, negligence, and breach of

warranty action against NMC-Wollard ("NMC") for injuries that Albert Waters ("Waters")

sustained while working on a belt loader manufactured by NMC or its predecessors.  Presently

before the court is NMC's motion for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  The motion presents two issues: (1) whether, as a matter of law, the

belt loader is not unreasonably dangerous, and (2) whether, as a matter of law, plaintiffs are

unable to establish the element of causation.  For the reasons that follow, I will deny NMC's

motion.

## I.       Background

### A.       Factual History

#### 1.       The Anatomy of a Belt Loader

NMC manufactures belt loaders, which are industrial vehicles equipped with an onboard,

1

motorized conveyor belt ("ramp"). (Pls.' Resp. to Def.'s Mot. Summ. J. Ex. B, Report of Peter

Poczynok at 2, May 5, 2008, ("Poczynok Report") (describing belt loaders as "a belt conveyer

mounted atop a drivable chassis").) Airlines use belt loaders to load and unload luggage from

aircraft. Fleet service agents (commonly referred to as "baggage handlers") drive the belt loaders

to arriving and departing aircraft, raise the ramp to an appropriate angle, climb the ramp, open

and access the aircraft's luggage hatch, and then load (or unload) luggage by sending the luggage

up (or down) the ramp. The agents can access an aircraft's luggage hatch only by using the ramp.

(*Id.* at 2 (stating that "[t]here is no other method of ascending and descending incorporated into

the design of the belt loader").)

     In 2004, U.S. Airways used two belt loader designs, the TC-888 and the TC-886, in its

daily operations. (Def.'s Mot. Summ. J. Ex. J, Report of Paul Dreyer at 3, June 13, 2008

("Dreyer Report").) Both products were manufactured by NMC or by its predecessors for which

NMC is liable. (*See* Def.'s Mot. Summ. J. Ex. B, Affidavit of Kevin Steingart ¶ 2, Dec. 30,

2005, ¶¶ 7-20 (detailing history of TC-886 and TC-888 manufacturing)); *see also Waters v.*

*NMC-Wollard*, No. 06-0032, 2008 WL 90241, at *8 (E.D. Pa. Jan. 9, 2008) (holding that product

line exception applies to this case). The designs of the TC-888 and the TC-886 are the same in

all relevant aspects. (Dreyer Report at 3 (stating that "the railing and belt system design on the

NMC Wollard TC-888 and TC-886 models in use at U.S. Airways in the Philadelphia airport are

essentially the same").) Relevant to this case, both designs employ a single-handrail system.

(Poczynok Report at 3.) The single-handrail system includes a collapsible handrail that, once

raised, runs parallel to and on the right side of the ramp.[1]  (Poczynok Report at 3; *see also* Pls.'

Br. in Opp'n of Def.'s Mot. For Summ. J. 3 (embedding picture of belt loader).)  The hand-rail is

attached to the ramp with five vertical supports, which run perpendicular to the belt loader,

approximately three feet apart.  (*See* Poczynok Report at 3; Driver Dep. 43:10-11, April 27,

2006.)  Fleet service agents are instructed to hold the handrail while climbing the ramp because

the steep inclines that are required to reach certain aircraft (e.g., Boeing 767s) can cause a loss of

balance.  (Dreyer Report at 7; Coscia Dep. 44:16-22, December 11, 2006.)  Importantly, the

designs do not include a second collapsible handrail for the left side of the belt loader;

consequently, the left side remains open.  (Poczynok Report at 4.)  In addition, the design does

not include an intermediate rail ("midrail"), which is a bar that would run parallel to the belt

loader, in between the ramp and the handrail.  (*Id.*)

### 2. Waters's Fall on June 1, 2004

In 2004, Waters was employed as a fleet service agent with U.S. Airways at the

Philadelphia International Airport.  (*See* Def.'s Mot. Summ. J. Ex. H, Pl's Resp. to Def.'s Req.

for Admis. ¶¶ 2-3.)  On June 1, 2004, Waters was preparing to unload an inbound Boeing 767

aircraft at gate A-18.  (Def.'s Mot. Summ. J. Ex. G, E-mail from Orazio Coscia to Bill

Richardson & John Yutzy at 2, June 6, 2004 ("Coscia E-mail").)  Waters positioned a belt loader

adjacent to the aircraft, raised the ramp, and began to climb the belt toward the luggage hatch on

---

[1] The handrail is designed with "pivots" at the top and bottom.  (Poczynok Report at 3.)
The pivots allow the handrail to fold rearwards between uses.  (*Id.*; *see also* Driver Dep. 32:18-
19, April 27, 2006 (noting that "sometimes handrails were also on the left side").)

the "rubber belt."[2] (Waters Dep. 60:18-24, April 24, 2006; *see also* Coscia E-mail at 2.) As

Waters reached the third vertical support bar (approximately half-way up the belt loader), he

slipped. (Waters Dep. 74:4-12; *see* Dreyer Report 1-2.) Waters "slipped off the belt . . . and then

from there, [Waters] fell and hit the front part of the belt loader, the front wheel of the belt

loader, [and finally] hit the ground."[3] (Waters Dep. 74:6-12.) The front wheel of the belt loader

is encased by a metal running board, which fleet service agents use as a step to climb onto the

ramp. (*See* Waters Dep. 75:18-24; Pls.' Br. in Opp'n of Def.'s Mot. Summ. J. 3 (embedding

picture of TC-888 model belt loader).) In total, Waters estimates that he fell seven feet. (Waters

Dep. 77:19-20.)

Waters has limited recollection of the events that preceded and caused his fall. (Waters

Dep. 60:8-10, 61:1-24, 72:11-16, 73:2-16, 74:13-24, 76:11-77:15.) Waters testified that in the

past, he always deployed the handrail before climbing the belt loader. (*Id.* 73:2-16.) Thus,

Waters assumes the handrail was deployed prior to his fall.[4] (*Id.* 73:14-16.) Moreover, Waters

---

[2] Orazio Coscia, Waters's supervisor, testified that he believed Waters was walking toward the aft cargo bin and that "for the 767, the aft bin is higher than the rear cargo bin, so the belt loader will be at a higher angle." (Coscia Dep. 51:24-52:8.) NMC's expert estimates that the belt angle at the time of Waters's fall was approximately thirty-four degrees. (Dreyer Report at 3.)

[3] Coscia's understanding of the incident, which is derived from his conversations with Waters after the fall, is reasonably consistent with Waters's testimony. In an email to Bill Richardson, Coscia stated:
>  The aircraft was a 767. He was getting a belt loader and he was putting it up to the rear cargo bin door. He was walking up the belt loader, when he slipped and fell. His face hit the belt loader and he slid about two feet, then he hit the ground."
(Coscia E-mail at 2. *But see* Coscia Dep.51:24-52:8 (recalling that Waters was climbing toward the aft bin rather than the rear cargo bin).)

[4] Waters testified that the "standard operating procedure is you [fleet service agents] pull the [belt loader to the aircraft] and [then] raise the—put the—you have to put the railing up, then

4

testified that the ramp was not running (i.e., the conveyor belt had not been turned on and was not rotating as Waters climbed the ramp). (*Id.* 73:17-74:1.) Waters, however, does not recall specifically what caused him to fall off of the belt loader.[5] (*Id.* 76:7-10.) Likewise, Waters is unable to identify the serial number or model of the belt loader he was climbing. (Pl's Resp. to Def.'s Req. for Admis. ¶¶ 12-13.)

Additionally, Waters does not recall many of the events that followed his fall.[6] (*Id.* 76:23-77:15.) Orazio Coscia, Waters's supervisor, explained that Waters walked to the bathroom, washed blood off of his face and uniform, and attempted to return to work. (Coscia Dep. 23:8-14; Coscia E-mail at 2.) Before he could return to work, Coscia located Waters, escorted him to a break room, and called for an ambulance.[7] (Coscia Dep. 23:4-14; Coscia Email at 1-2.) When the ambulance arrived, Waters was taken to the Mercy Fitzgerald Hospital Emergency Room for treatment. (Coscia E-mail at 2; *see generally* Pls.' Br. in Opp'n of Def.'s Mot. Summ. J. Ex. C (Waters's medical records).) Mark Vendemia, a lead agent for U.S. Airways at the time of the incident, accompanied Waters to the hospital. (Coscia E-mail at 2; Vendemia Dep. 47:1-8, 48:18-22.) Plaintiffs assert that as a result of the fall, Waters has

---

you raise the belt loader up to the airplane." (Waters Dep. 123:1-6.)

[5] Coscia asked Waters "[three] times what happened and he replied back that he took a couple of steps, slipped, and landed on the belt loader." (Coscia E-mail at 2.)

[6] Waters testified that his memory was refreshed after he reviewed medical documents and accident reports. (Waters Dep. 61:1-6.)

[7] When Coscia found Waters, Waters had blood on his face and uniform and looked "scared." (Coscia Dep. 23:10-14, 17.) Coscia conveyed his observations to his supervisors: "I noticed he [Waters] had a long cut and blood on the left side of his face. He also had blood on his left shoulder on his uniform. . . . He told me he fell." (Coscia E-mail at 1.)

suffered severe brain damage.  (Pls.' Br. in Opp'n of Def.'s Mot. Summ. J. 4.)

### 3.    The Experts' Reports

To provide the court with a better understanding of the TC-888 and TC-886 belt loader

designs, each party presents the court with an expert report.

Plaintiffs' expert, Peter J. Poczynok, examined a TC-888 belt loader at the Philadelphia

International Airport.  (Poczynok Report at 2.)  Poczynok began his analysis by explaining that

handrails serve multiple purposes.  (*Id.* at 3.)  A handrail provides "a handhold for individuals to

grasp in the event that they fall" and acts "as a fall protection barrier to prevent individuals from

falling from heights."  (*Id.*)  Poczynok further explained that handrails are designed to stand at a

particular height to prevent individuals from falling over the handrail.  (*Id.*)  When raised to this

particular height, however, individuals coming into contact with a handrail have a "propensity . .

. to pass below the top rail rather than over it."  (*Id.*)  To prevent individuals from falling below

the rail, designers frequently incorporate intermediate rails; a second option calls for additional

vertical bars to reduce the amount of space between vertical supports.  (*Id.* at 3-4.)

NMC's TC-886 and TC-888 designs, Poczynok concluded, "exhibit numerous

shortcomings with respect to fall protection."  (*Id.* at 4.)  These shortcomings include: (1) the belt

loader lacks dual-handrails; (2) the height of the current handrail is too low; and (3) the current

design lacks an intermediate rail.  (*Id.*)  Poczynok reasoned that each of his concerns can be met

with feasible alternative designs.  (*Id.*)  First, Poczynok noted that NMC has manufactured a dual

handrail belt loader in the past, evidencing NMC's ability to manufacture a belt loader with two

handrails.  (*Id.*)  Second, Poczynok explained that the current handrail could be raised to reach a

height of forty-two inches, and that "telescopic supports," like those included in the current NMC

6

design, would solve any packaging problems. (*Id.*) Third, including a midrail is possible with

the implementation of one of many designs. (*Id.*) Alternatively, rather than implement a midrail,

the NMC belt loaders could include additional vertical support bars "to fill in the generous

spaces between the five current supports." (*Id.* at 5.) Finally, the additions Poczynok proposed

would not create packaging problems because "the conveyor bed assembly resides significantly

inboard of the overall vehicle width, so additional railing elements would not increase the overall

width of the unit." (*Id.*) In proposing these alternatives, Poczynok stressed the importance of fall

protection devices on NMC's belt loaders:

> In the case of a [NMC] belt loader, the manufacturer has chosen not to equip the unit
> with separate provisions for workers to climb up and down[,] to and from an aircraft.
> . . . Instead, they have designated the conveyor itself as the means for transporting
> and supporting its workers. For these purposes the conveyor is not optimized, as its
> primary function is to transport baggage to and from an aircraft. As such, even
> greater importance is placed on the need for an effective fall protection system.

(*Id.*) Without a fall protection system, Poczynok concluded that "[t]he subject belt loader is

defective and unreasonably dangerous." (*Id.* at 6.) Poczynok further concluded that "[t]he

presence of an effective fall prevention railing system would have prevented Mr. Waters's fall

and associated injuries."[8] (*Id.*)

NMC's expert, Paul Dreyer, contended that NMC's belt loader design satisfies the

applicable industry standards. (Dreyer Report at 7.) Dreyer reasoned that "the design of the belt

loader by [NMC] was a safe and proven design that followed industry standards and [that] was

used over decades without similar incidents." (*Id.*; *see also id.* at 6 ("A single hand hold railing

---

[8] It would seem the absence of an intermediate rail and the height of the handrail are
nonissues in this matter because Waters testified that he fell onto the belt and then, from there,
fell and hit the front part of the belt loader, the front wheel of the belt loader, and then the
ground. He did not fall over or under the handrail.

design is the industry standard and has been used safely for years.  If there was any evidence of a defect or an unreasonably dangerous design it surely could have manifested itself during the decades the single hand hold railing design has been in use[.]").)  Dreyer explained that belt loaders are to be used only by trained and experienced baggage handlers, (*id.* at 7; *see also id.* at 4 ("Although the railing could assist in fall protection[,] the design is specifically intended for properly trained personnel in an industrial environment[.]")), and that these "[t]rained handlers are fully aware of the elevated position of the belt and the obvious danger if they do not use sufficient care for their own safety," (*id.* at 4).  With respect to Waters's accident, Dreyer determined that the single handrail, which Waters should have been holding, would have prevented Waters from falling off of the belt loader.  (*Id.* at 7.)  Because Waters did fall off of the belt loader, Dreyer concluded that Waters "must have not been securely holding onto the hand rail, as he was trained, and as he did countless times before without incident."  (*Id.*)

## B.   Procedural History

Plaintiffs originally filed this case in the Philadelphia Court of Common Pleas.  On January 4, 2006, NMC and its co-defendants filed a notice of removal to this court, and plaintiffs responded on February 3, 2006 with a motion to remand, which the court denied on February 21, 2006.  Plaintiffs filed an amended complaint on April 6, 2006, which was superseded by a revised amended complaint filed on April 10, 2006.  The revised amended complaint named NMC, Wollard Airport Equipment, Inc., Wollard Equipment Company, Inc., Wollard Airport Equipment Company, Northwestern Motor Co., Hobart Brothers Company ("Hobart"), Northwestern Motor Co., Inc., Steingart Acquisition Co., Ground Power Liquidating, Inc., and Criton Technologies as defendants.

8

On February 22, 2007, NMC and Hobart each filed a motion for summary judgment on the issues of product and manufacturer identification. On September 5, 2007, the court denied NMC's motion, granted Hobart's motion, and terminated all parties as defendants except for NMC. Hobart remained only as a defendant in a cross-claim brought by NMC. On May 7, 2008, Hobart filed a motion for summary judgment with respect to NMC's cross-claim. My order of August 27, 2008 granted Hobart's motion, terminated Hobart as a party to NMC's cross-claim, and left only plaintiffs and NMC as parties to this action.

Because several of the originally-named defendants manufactured belt loaders, plaintiffs and NMC raised the issue of successor liability. Plaintiffs and NMC each moved for summary judgment on the issue of the product line exception. At issue in that motion was whether NMC was potentially liable for defective products manufactured by three of its predecessors.[9] On January 9, 2008, finding that the product line exception was applicable to this case and that NMC was liable for the products manufactured by its predecessors, I granted plaintiff's motion and denied NMC's. By finding that the product line exception applied, the court concluded that NMC is potentially liable for injuries caused by both the TC-888 and the TC-886.

On August 4, 2008, NMC filed the instant motion for summary judgment, arguing that as a matter of law, the NMC belt loader is not unreasonably dangerous and that plaintiffs are unable to establish the element of causation. Plaintiffs filed their response on September 8, 2008 and NMC filed its reply on September 12, 2008. Thus, the issues are fully briefed and ripe for the court's review.

---

[9] The relationship between NMC and its predecessors is detailed in the court's memorandum filed on January 9, 2008. *See Waters*, 2008 WL 90241, at *1-2.

9

## II.    Legal Standard

A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

"Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)). The nonmoving party must present concrete evidence supporting each essential element of its claim. *Celotex*, 477 U.S. at 322-23. In doing so, the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not rely merely on bare assertions, conclusory allegations, or suspicions, *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

10

### III. Discussion

NMC's motion presents the court with two issues. First, NMC argues that as a matter of law the belt loader is not unreasonably dangerous. Second, NMC contends that plaintiffs, as a matter of law, are unable to establish the element of causation.

### A. Whether the Belt Loaders Are Unreasonably Dangerous

As the parties acknowledge, Pennsylvania law applies to this diversity action. Pennsylvania adheres to Section 402A of the Restatement (Second) of Torts for strict liability claims.[10] *See Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966); *see also Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1043 (3d Cir. 1997) ("Pennsylvania early on adopted the Restatement (Second) of Torts as the law of strict products liability in Pennsylvania."). "Under Pennsylvania law, strict liability allows recovery when a defective product that is 'unreasonably dangerous' causes harm to a user or consumer." *Moyer v. United Dominion Indus.*, 473 F.3d 532, 538 (3d Cir. 2007); *see Azzarello v. Black Bros. Co.*, 391 A.2d 1020, 1024 (Pa. 1978). Because this determination involves a social policy analysis, Pennsylvania law requires the judge to make a threshold determination of whether the product at issue is "unreasonably dangerous." *Surace*, 111 F.3d at 1044.[11] To make this determination, the court must engage in a risk-utility analysis, asking

---

[10] Section 402A provides in relevant part:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
Restatement (Second) of Torts (1965).

[11] In *Surace*, the plaintiff was injured when a profiler, which was manufactured to "mill rumble strips" at the base of a bridge, backed over the plaintiff's right foot. 111 F.3d at 1042-43. Although the profiler was equipped with several safety devices, the plaintiff argued that the

"whether a product's condition justifies placing the risk of loss on the supplier."[12] *Id.* at 1042.

Pennsylvania courts and the Third Circuit have identified seven factors for the court to weigh when engaging in the risk-utility analysis:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole; (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

*Id.* at 1046 (quoting *Dambacher v. Mallis*, 485 A.2d 408, 423 n.5 (Pa. Super. Ct. 1984)). The judge analyzes these factors "under a weighted view of the evidence, considering the facts in the light most favorable to the plaintiff." *Moyer*, 473 F.3d at 538. If the court determines that as a matter of law the product is "unreasonably dangerous," then the case is submitted to the jury "to determine whether the facts indicate that when the product left the manufacturer's control it 'lacked any element necessary to make it safe for its intended use or possessed any feature that renders it unsafe for the intended use.'" *Surace*, 111 F.3d at 1044 (quoting *Azzarello*, 391 A.2d at 1027) (alterations omitted). Alternatively, if the court concludes as a matter of law that "the

---

profiler was defective because it failed to include a "lock-out/tagout" device. *Id.* at 1043. Unless de-activated by the ground crew, the lock-out/tagout device would prevent the profiler from reversing. *Id.* The court concluded that the profiler was unreasonably dangerous and, in doing so, set forth the legal framework that governs the majority of my analysis. *Id.* at 1043-47.

[12] "In answering this question a court is essentially making a social policy determination and acting as both a social philosopher and a risk-utility economic analyst." *Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 224 (Pa. Super. Ct. 1997).

risk-utility balance so favor[s] the manufacturer that the [product] could not be deemed unreasonably dangerous," the claim will not be submitted to the jury. *Id.* at 1048.

Although the parties may properly raise this issue in a motion for summary judgment, the "question for the court to determine is whether the evidence is sufficient, for purposes of the threshold risk-utility analysis, to conclude as a matter of law that the product was not unreasonably dangerous, not whether the evidence creates a genuine issue of fact for the jury." *Id.* at 1049 n.10. With this framework in mind, I now consider each of the seven factors to determine whether, as a matter of law, the NMC belt loaders are not unreasonably dangerous.

### 1.     Utility of the Belt Loader to Waters and to the Public

The first factor involves an analysis of the usefulness and desirability of the NMC belt loader designs. *See id.* at 1053. Belt loaders play an important role in the airline industry. As a court recently stated, "it is beyond cavil that belt loaders are useful machines." *Warnick v. NMC-Wollard*, 512 F. Supp. 2d 318, 325 (W.D. Pa. 2007). Defendant asserts that belt loaders are necessary to move luggage to and from commercial aircraft.[13] (Mem. of Law in Supp. of Def.'s Mot. Summ. J. 11.) Plaintiffs concede this point.[14] (Pls.' Resp. to Def.'s Mot. Summ. J. 8.)

---

[13] NMC persuasively explains without contradiction that:
Without the belt loaders it would be nearly impossible to move cargo and luggage in and out of commercial aircraft. The loaders are driven to arriving and departing aircraft and the conveyor belt is raised to the cargo holds of the aircraft. Luggage is taken into and from the holds by way of the conveyor belt. Belt loaders, such as the belt loaders used by U.S. Airways at the Philadelphia International Airport, have been used by airlines at "numerous airports thousands of times per year, year after year." (Def.'s Mot. Summ. J. 11 (quoting Dreyer Report at 6).)

[14] Plaintiffs argue that despite its utility, the design of the belt loader should implement safety devices to prevent its users from falling off of the ramp. (*See* Pls.' Resp. to Def.'s Mot. Summ. J. 8.) When analyzing the first factor, however, the court does not compare the product as designed to a hypothetical product that a plaintiff proposes. Rather, the court must look to the

Thus, the first factor weighs in NMC's favor.

### 2.   The Safety Aspects of Belt Loaders—Likelihood of Injury, and the Probable Seriousness of the Injury

The second factor concerns the safety aspects of the belt loader, with specific emphasis on the likelihood of injury and the seriousness of any injury caused by the product. Plaintiffs argue that the belt loader is a "runway" as defined by an Occupational Safety and Health Administration ("OSHA") regulation. Plaintiffs assert that because the belt loader is a runway, NMC violated OSHA regulations by failing to provide a second handrail and a midrail. NMC argues that OSHA is inapplicable to this case. Further, with respect to the safety aspects of the belt loaders, NMC argues that the risk of injury is low.

Pennsylvania courts restrict the evidence that I can consider when weighing this factor. Specifically, the fact that a product *may forseeably cause* injury is not legally dispositive. *See Monahan v. Toro Co.*, 856 F. Supp. 955, 959 (E.D. Pa. 1994). Rather, Pennsylvania law stresses the need to separate negligence concepts, such as forseeability, from a products liability case. *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1006 (Pa. 2003) (reasoning that negligence concepts have "no place" in strict liability case and that "strict liability affords no latitude for the utilization of foreseeability concepts"). Instead, courts consider the number and types of accidents that *have actually occurred* and the severity of injuries sustained in those accidents.

---

existing product as a whole and determine its usefulness and desirability. *See Surace*, 111 F.3d at 1053 (concluding that "profiler is, of course, useful and desirable"); *Epler v. Jansport, Inc.*, No. 00-154, 2001 WL 179862, *3 (reasoning that "the case law found by this Court implies that this first risk/utility analysis factor concerns the utility of the product as a whole, not simply the utility of one particular piece of the product"). Thus, a large portion of plaintiffs' argument with respect to this first factor misses the mark, as plaintiffs' argument does not focus on the utility of the existing belt loader design.

*Surace*, 111 F.3d at 1053; *Van Buskirk ex rel. Van Buskirk v. West Bend Co.*, 100 F. Supp. 2d 281, 286 (E.D. Pa. 1999), *aff'd* 216 F.3d 1078 (3d Cir. 2000); *see also Monahan*, 856 F. Supp. at 959 (relying on statistical data from past injuries in determining that likelihood of injury was low).

Here, plaintiffs proffer no evidence of past injuries caused by the belt loader's alleged defect. Rather, plaintiffs argue that the belt loader violates OSHA. Plaintiffs' argument is beyond the reach of this second factor. Although OSHA regulations protect against injuries occurring in the workplace, a product's non-compliance with an OSHA regulation does not necessitate the conclusion that the product at issue carries high risks of serious injury. At most, this is evidence that the product carries certain risks. Even so, the purported OSHA violation has little effect on this factor because the plaintiffs present no evidence concerning past injuries and the corresponding severity of such injuries. Thus, plaintiffs' argument is not persuasive with respect to this factor.

Defendant's expert asserts that no other injuries like those suffered by Waters have ever occurred. (Dreyer Report at 5 (reasoning that NMC belt loaders are used "thousands of times per year, year after year, without a similar reported incident").) Moreover, Waters used the belt loader for eight previous years without incident. *See Warnick*, 512 F. Supp. 2d at 326 (considering fact that fleet service agent experienced only two belt loader related injuries in twenty years as evidence that injuries from use of the belt loader's running board were unlikely). Waters also testified that he was not aware of any other fleet service agent falling off of the belt loader. (Waters Dep. 116:21-23.) Combined, this evidence suggests that the likelihood of an individual falling off of the belt loader is low. The plaintiffs have proffered no evidence to the

15

contrary. Consequently, this second factor weighs in NMC's favor.

### 3.   The Availability of a Substitute Product Which Would Meet the Same Need and not Be as Unsafe

The third factor assesses the availability of a substitute product that is safer overall than the current design. *Surace*, 111 F.3d at 1053. Plaintiffs argue that alternative designs would bring NMC's belt loader into compliance with OSHA without requiring NMC to create a "substitute" product. NMC claims that the current belt loader designs meet the industry standard and that the open side of the belt loader does not pose a threat when the fleet service agent holds the existing handrail while climbing the ramp.

The evidence overwhelmingly demonstrates the availability of a feasible substitute design that would include both a second handrail and a midrail. First, Poczynok concluded that NMC is technically and economically capable of manufacturing a belt loader with dual handrails. (Poczynok Report at 6; Pls.' Resp. to Def.'s Mot. Summ. J. Ex. F, Affidavit of Peter Poczynok ¶¶ 6-7 ("Poczynok Affidavit").) Additionally, Peter Driver, the chief design engineer at NMC, testified that adding a second handrail presents no design or manufacturing problems. (Driver Dep. 49:3-10.) Finally, NMC *has manufactured* belt loaders with dual handrails in the past. (*Id.* 32:20-21; *see also* Dreyer Report at 5.) Based on this evidence, I find that a substitute design exists and that NMC is capable of implementing it.

The evidence also demonstrates that it is both economically and technically feasible to include a midrail or additional vertical supports to reduce the risk of falling below the handrail. Poczynok detailed the options in his report:

> [An intermediate rail] could take the form of a separate detachable rail that would be affixed to the railing system once it was deployed. In the alternative, if used in

16

conjunction with telescoping supports, it could move to the position of the top rail while being rotated into position and then remain at its rotated height while the top rail is telescopically raised into position above it. A third potential embodiment of the intermediate rail design involves a second rail and support system located beside and outboard of the first that rotates up with it and remains in place at a lower overall height.

(Poczynok Report 4.) Neither NMC nor its expert refuted Poczynok's finding regarding the ability to include a midrail in the design of the belt loader.

The record further suggests that the added handrails will increase the overall safety of the belt loaders by reducing or eliminating many fall hazards. In his expert report, Poczynok detailed the current fall hazards: (1) the design only implements a single-rail system, leaving the entire left side of the belt loader open to falls; (2) the single handrail on the right side is too low to the ground, creating the risk that a person could fall *over* the rail; (3) the spacing between the vertical support rails is too great, allowing a person to fall *between* the vertical support rails; and (4) the design does not implement a midrail, creating the possibility that individuals could fall *under* the handrail. (*Id.*) By implementing a dual handrail system and a midrail, Poczynok concluded that the belt loader would include the proper fall protection devices. (*Id.* 4-6 (noting that Waters's accident would have been avoided).)

To combat plaintiffs' expert, NMC and its expert asserted that the current belt loader design meets a well-established industry standard, which utilizes a single-rail system. (Dreyer Report at 6-7.) Under Pennsylvania law, however, evidence of industry standards is irrelevant to the issue of whether the product is unreasonably dangerous. *Shouey ex rel. Litz v. Duck Head Apparel Co., Inc.*, 49 F. Supp. 2d 413, 422 (M.D. Pa. 1999) (citing *Lewis v. Coffing Hoist Div., Duff-Norton Co.*, 528 A.2d 590, 594 (Pa. 1987)) ("Because it implicates negligence concepts,

17

evidence of industry standards is not admissible in a strict products liability action."); *Monahan*, 856 F. Supp. at 960 (citing *Holloway v. J.B. Systems, Ltd.*, 609 F.2d 1069, 1073 (3d Cir. 1979)) (reasoning that "it is inconsistent with a strict liability analysis to consider what is or is not standard practice in an industry"). A large portion of NMC's argument with respect to this factor is therefore irrelevant.

NMC also reminds the court that "the mere allegation that a safer design exists—without proof that the original design was unreasonably dangerous—does not constitute a design defect." *See Warnick*, 512 F. Supp. 2d at 327 (citing *Pascale v. Hechinger Co.*, 627 A.2d 750, 753 (Pa. Super. Ct. 1993)). However, plaintiffs have presented an expert's analysis that specifically details the dangers associated with the current belt loader designs and explains the many advantages of a safer, alternative belt loader design. Viewing this evidence in the light favorable to plaintiffs as I must, plaintiffs have presented "proof that the original design was unreasonably dangerous." *Id.* Accordingly, because the evidence strongly suggests the availability of a feasible alternative design that will enhance the safety of the belt loader, this third factor weighs heavily in plaintiffs' favor.

**4.    NMC's Ability to Eliminate the Unsafe Character of the Product Without Impairing its Usefulness or Making it too Expensive to Maintain its Utility**

The fourth factor assesses the ability of a new design to eliminate the unsafe character of the product without impairing the product's utility or making it too costly to maintain the product's utility. *See Surace*, 111 F.3d at 1048-49. Plaintiffs argue that this factor weighs in their favor because no evidence suggests that the substitute designs would impair the belt loader's usefulness or cause NMC to incur excessive manufacturing costs. NMC argues that the

18

changes "would impair" and "could impede" the function and usefulness of the belt loader.

As discussed above, plaintiffs' expert asserted that the new design reduces the number and severity of the fall hazards that currently exist on the NMC belt loaders. (Poczynok Report at 4-5.) The new design would implement a second collapsible handrail on the left side of the belt loader and would include a midrail on each handrail. (*Id.*) These additions, according to Poczynok, would help to overcome the "numerous shortcomings with respect to fall protection." (*Id.* at 4.) Importantly, although this factor asks whether the design changes would "eliminate" the unsafe character of the product, a total elimination of a product's risk is not required. *See Surace*, 111 F.3d at 1049. Instead, a court can consider whether a new design would "cut the risk [associated with the product] significantly." *Id.* Plaintiffs' expert testimony easily meets this standard.

With respect to the belt loader's utility, NMC asserts that the new design will "impair the utility of the belt loader and likely create additional hazards." (Def.'s Mot. Summ. J. 13.) NMC proffers no evidence to support this allegation. Later in its argument, NMC alleges that the "second handrail could impede the function of the loader." (*Id.*) Again, NMC cites to no evidence that supports this assertion. Finally, NMC argues that separate provisions for climbing (e.g., a stairway) are impractical. (*Id.*) Dreyer's expert report does support this contention; however, this finding only addresses a separate stairway system which would allow a fleet service agent to walk up stairs instead of walking on the ramp. (Dreyer Report at 5 ("*Separate provisions* for worker climbing [have] been found not to be practical or needed for safe use." (emphasis added)).) Dreyer's statement does not support NMC's contention that a second handrail impairs its functionality; at most, Dreyer's report asserts that a second handrail is not the

industry standard, and is therefore not necessary. This conclusion, however, does not address the issue of whether an additional handrail would impair the belt loader's functionality. Conversely, Poczynok concluded that incorporating both a second handrail and a midrail was "technically and economically feasible." This uncontradicted evidence strongly suggests that the added safety features will not "impair" or "impede" the functionality or utility of the belt loader.

The cost of the new safety devices is less clear. In his deposition, Peter Driver testified that the increase to manufacturing costs would be in the "hundreds." (Driver Dep. 49:14-17.) Driver was unable to provide a precise estimate, (*id.* 49:18-21), and neither party has presented the court with evidence of the additional cost. However, viewing the evidence in the light most favorable to plaintiffs, as I must, Driver's testimony tends to show that the cost to implement the alternative design is not disproportionately high.

Because the record strongly suggests that the substitute design will reduce the current product's risks without impairing its utility or disproportionately increasing its costs, this fourth factor weighs heavily in plaintiffs' favor.

### 5. An Ordinary User's Ability to Avoid Danger by the Exercise of Care in the Use of the Product

The fifth factor analyzes whether a user could avoid a product's risks with the exercise of due care. As the Third Circuit has noted, when deciding whether a product is unreasonably dangerous, "it is irrelevant that the injury was the result of the . . . consumer's negligence." *Surace*, 111 F.3d at 1050 ("An *individual plaintiff's* failure to exercise care in the use of a product is not relevant to whether the product is unreasonably dangerous in the first place."). To avoid focusing on Waters's conduct, I must engage in "an objective inquiry into whether the

class of ordinary purchasers [or users] of the product could avoid injury through the exercise of care in use of the product." *Id.* at 1051 (holding that inquiry is "not whether *this particular plaintiff* could have avoided this particular injury"). Plaintiffs argue that "[t]here is no evidence that Mr. Waters contributed [to] the happening of this incident." (Pls.' Resp. to Def.'s Mot. Summ. J. 11.) NMC contends that Waters could have avoided the accident, as Waters had done during his eight previous years of employment.

Both parties inaccurately aim the focus of their arguments on whether Waters acted with due care as he climbed the belt loader. Because Pennsylvania law precludes the court from considering the individual plaintiff's actions, the parties' arguments are not relevant to my consideration of this fifth factor. Consequently, the parties provide no argument and little evidence concerning whether *an ordinary user* could have avoided injury. The only relevant evidence comes from NMC's expert. He asserts that a fleet service agent adhering to the protocols taught in training would negotiate the belt loader without risk of injury. (Dreyer Report at 6, 7; *see also id.* at 4 (noting that trained fleet service agents are "fully aware of the elevated position of the belt and the obvious danger".) No evidence of this training (e.g., a training or operations manual[15]) is before the court. Regardless, although holding onto the single handrail at all times may prevent a fall from the belt loader, I find it likely that while going up or down the ramp, fleet service agents (the ordinary users) will find it necessary to release their grip of the handrail to move their hand up or down the railing as they proceed, or to open and close the

---

[15] It appears that relevant manuals do exist—NMC's expert reviewed operations and maintenance manuals that NMC circulates to its clients. (Dreyer Report at 2-3.) In addition, U.S. Airways appears to distribute rules that govern a fleet service agent's use of the belt loaders. (*See* Waters Dep. 78:22-23 (discussing a U.S. Airways rule regarding use of the existing handrail).) The relevant portions of these manuals are not before the court.

luggage hatch. *Cf. Surace*, 111 F.3d at 1052 ("[I]t seems likely that ordinary workers at a highway construction site will occasionally find it necessary to step behind the machine, and that such workers, may, like [the plaintiff] be . . . unable to avoid danger if the profiler's operator backs up without signaling."). Based on this finding, the fifth factor weighs slightly in Waters's favor.

        **6.**    **The User's Anticipated Awareness of the Dangers Inherent in the Product and Their Avoidability, Because of General Public Knowledge of the Obvious Condition of the Product, or of the Existence of Suitable Warnings or Instruction**

The focus of the sixth factor is on the product: the court must consider "'the user's anticipated awareness of the dangers inherent *in the product* and their avoidability, because of general public knowledge of the obvious condition *of the product*, or of the existence of suitable warnings or instruction[.]'" *Id.* at 1052 (quoting John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 842-43 (1973)) (emphasis added). Plaintiffs argue that "any layman" would be unaware of the fall hazards created by the absence of a midrail, and that such hazards are unavoidable while performing the tasks of a fleet service agent. (Pls.' Resp. to Def.'s Mot. Summ. J. 12.) NMC argues that "it is common knowledge that losing one's balance while walking up a conveyor belt can cause one to fall and sustain head injuries[.]" (Mem. of Law in Supp. of Def.'s Mot. Summ. J. 14.)

NMC's arguments miss the mark. Instead of focusing the argument on the product itself, the NMC focuses on the actions of the product's user. Defendant incorrectly engages the question of whether the ordinary user's own actions would create an obvious risk. Despite this oversight, the record does include some evidence that supports NMC's position. First, fleet

service agents, prior to Waters's fall, voiced concerns over the quality of the belt loaders. (Plummer Dep. 25:19, September 6, 2006.) Michael Plummer, a U.S. Airways shift manager, testified that "[e]veryone complains about the equipment." (*Id.*) However, this vague statement does not support a finding that fleet service agents were aware of the inherent risks created by the single handrail system. Second, evidence reveals that fleet service agents are trained in operating the belt loaders, are provided with an operations manual of some kind, and are aware of the risks associated with climbing the belt loader. (*See* Dreyer Report at 2, 4; *see also id.* at 4 (concluding that trained fleet service agents were aware of and could have avoided risks).) Based on this evidence, I find it likely that an ordinary user may be aware that the open side of the belt loader poses serious health and safety risks.

That some risks are obvious does not end my inquiry. *Id.* (quoting Wade, *supra*, at 842-43) (reminding that "it is not necessarily sufficient to render a product duly safe that its dangers are obvious, especially if the dangerous condition could have been eliminated"). Several risks associated with the belt loader are not obvious. Specifically, I find it unlikely that an ordinary user would know that the height of the existing handrail was too low, that the vertical supports were too far apart, or that the absence of a midrail created an increased risk of falling below the existing handrail, as suggested by Poczynok. I find it equally unlikely that, without knowledge of these risks, an ordinary user could have avoided these dangers. Because it is likely that several hazards are not obvious to the general public or to the ordinary user, the sixth factor weighs slightly in favor of plaintiffs.[16]

---

[16] Defendant relies heavily on and asks me to follow *Warnick v. NMC-Wollard*, a case that, like this case, involved the TC-886 NMC belt loader. 512 F. Supp. 2d at 320. *Warnick*, however, differs in many material ways from this case. First, *Warnick* involved a different

alleged defect. In *Warnick*, the plaintiff was attempting to "step up from the ground onto the running board of a belt loader when he fell and implanted his right thumb into the metal grate of the running board." *Id.* The plaintiff in *Warnick* claimed "that the belt loader was defectively designed because it required users to *negotiate an unnecessarily high step without the benefit of handrails.*" *Id.* (emphasis added); *see also id.* at 326. Therefore, *Warnick* focused on the dangers involved with accessing the ramp, whereas this case focuses on the dangers associated with climbing the belt loader (the single-rail system), *after* having accessed the ramp.

In addition to factual differences, the evidence in this case supports a different outcome than that reached by the *Warnick* court. The evidence presented by the parties in this case leads me to weigh factors three, four, five and six in plaintiffs' favor. In *Warnick*, the evidence led the court to the opposite conclusion when weighing factors three through six.

The *Warnick* court found that the third factor weighed in the defendant's favor because the defendant proffered uncontradicted evidence to show that adding additional steps to aid fleet service agents in accessing the belt loader would "create new tripping hazards" and "make the belt loaders *more* dangerous." *Id.* at 327. Here, defendant offers no such evidence, relying instead on the industry standard. Moreover, unlike the plaintiff in *Warnick*, plaintiffs in this case have produced substantial and uncontradicted evidence to demonstrate the availability of an alternative and safer design.

When examining the fourth factor, the *Warnick* court again relied on the defendant's uncontradicted evidence, which demonstrated that additional steps and handrails could make the belt loaders more dangerous. *Id.* The uncontradicted evidence also suggested that the proposed design changes would be impractical. *Id.* First, lowering the height of the running board was not feasible because "'it would expose more of the unit's operating surfaces to damage by other ground support equipment.'" *Id.* at 328 (quoting defendant's motion). Second, the additional handrails would interfere with the "proper function of the belt loader." *Id.* The *Warnick* court dismissed the plaintiff's unsupported and conclusory statements to the contrary.

Unlike *Warnick*, plaintiffs in this case have presented evidence, in the form of an expert report, to demonstrate that the proposed alternative design would increase the safety of the belt loader without diminishing its utility or functionality. In what amounts to a reversal of the roles in *Warnick*, here, defendant relies on unsupported allegations, specifically that the proposed changes "could impede" and "would impair" the belt loader's usefulness. Accordingly, plaintiffs' evidence requires a different conclusion from that in *Warnick* with respect to this fourth factor.

The *Warnick* court also weighed the fifth and sixth factor in favor of the defendant, finding that "an ordinary user of these belt loaders could, by the exercise of care in stepping on and off the equipment, avoid losing his balance . . . ." *Id.* at 328. Again, the evidence in this case differs from that presented in *Warnick*. First, defendant in this case offers little evidence that is relevant in evaluating either the fifth or sixth factor. Further, unlike *Warnick*, many of the risks associated with a single-rail system are not readily apparent to the ordinary user. Thus, I find that the plaintiffs' argument with respect to factors five and six is persuasive.

Therefore, while *Warnick* involved one of the belt loader models at issue here, this case presents many differences, both in the facts of the case and in the evidence offered by the parties.

7.    **The Feasibility, on the Part of the Manufacturer, of Spreading the Loss**

The final factor looks at the feasibility, on the part of the manufacturer, of spreading the risk of loss, by setting or adjusting the price of the product or by carrying liability insurance. In general, all manufacturers can spread the risk of loss by adjusting the price of the product or by carrying (or increasing) liability insurance coverage. When, however, "consideration of the preceding six factors leads to the conclusion that the utility of [the] product in question outweighs its risks, such determination compels the further conclusion that shifting the cost of plaintiff's loss to the manufacturer of the product is not fair, and, therefore, not feasible." *Warnick*, 512 F. Supp. 2d at 329 (quoting *Riley v. Becton Dickinson Vascular Access., Inc.*, 913 F. Supp. 879, 890 (E.D. Pa. 1995)). In this case, the third, fourth, fifth and sixth factors all weigh in plaintiffs' favor, with factors three and four weighing heavily for plaintiffs. Because the previous six factors weigh in plaintiffs' favor and because I find it likely that NMC, as a manufacturer, can spread the risk of loss, the seventh factor weighs in plaintiffs' favor.

An analysis of the seven factors under the weighted view reveals that five of the seven factors weigh in favor of plaintiffs. Because the threshold risk-utility balance supports plaintiffs, I cannot hold that as a matter of law the NMC belt loader is not unreasonably dangerous. Accordingly, I must deny NMC's motion for summary judgment on this issue.

**B.    Causation**

NMC contends that because plaintiffs cannot identify the precise belt loader that Waters

---

I therefore decline defendant's invitation to rely solely on *Warnick* in reaching my conclusion under the risk-utility framework.

was using at the time of his fall, plaintiffs, as a matter of law, cannot prove which belt loader caused the injuries Waters sustained. NMC also contends that plaintiffs are unable to prove that the belt loader was defective when it left the manufacturer, as it "could have endured substantial alterations after leaving NMC's door." (Mem. of Law in Supp. of Def.'s Mot. Summ. J. 17.) In response, plaintiffs argue that they will present expert testimony to establish that all NMC belt loaders are "virtually identical" and that all such designs "have the same defects" that caused Waters's injury.

Under Pennsylvania law, a plaintiff "may prove identification [of the product] through circumstantial evidence." *Payton v. Pennsylvania Sling Co.*, 710 A.2d 1221, 1224 (Pa. Super. Ct. 1998); *see Davis v. Berwind Corp.*, 640 A.2d 1289, 1295 (Pa. Super Ct. 1994) (discussing elements that plaintiff must established in strict liability case); *see also Parks v. AlliedSignal, Inc.*, 113 F.3d 1327, 1333 (3d Cir. 1997) (reasoning that although "causation . . . is not the primary focus" of section 402A cases, "[c]ausation may be shown by process of elimination or circumstantial evidence"). This is especially true in design defect cases, where a plaintiff attacks the safety of an entire product line rather than the manufacturing of one product from within a product line. *See Warnick*, 512 F. Supp 2d at 330 (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79-80 (3d Cir. 1994)) (reasoning that "preservation of the allegedly defective product usually is not required in design defect cases"). Here, the evidence suggests the TC-888 model and TC-886 model are similar (Dreyer Report at 3), that each design shares the same design defects (Poczynok Affidavit ¶ 4), and that Waters was climbing either the TC-888 or the TC-886 at the time of his fall (Coscia E-mail at 1-2; *see also Waters*, 2008 WL 90241 at *1). Because this is a design defect case and plaintiff need not point to the particular product that caused his

26

injury, this evidence creates a triable issue of material fact.  Thus, summary judgment on the

issue of product identity is inappropriate.[17]

The remaining issue is whether, as a matter of law, plaintiffs are unable to prove that the

product was not substantially altered by a third party after leaving the manufacturer's possession.

"The issue of substantial change, like proximate cause, is generally one for the jury.  However,

where no genuine issue of material fact is presented, the court may grant summary judgment."

*Hollinger v. Wagner Mining Equip. Co.*, 667 F.2d 402, 407 (3d Cir. 1981).[18]  For the purposes of

this motion for summary judgment, NMC must submit evidence to show that there is no genuine

issue of material fact with respect to the issue of substantial alteration.  *Celotex*, 477 U.S. at 323.

Because NMC has presented no evidence to even support that the belt loader Waters used was

substantially altered, NMC fails to meet its initial burden under Rule 56(c).[19]  Regardless, when

---

[17]All four manufacturers of Wollard belt loaders are linked by successor liability, rendering NMC liable for all previous manufacturers of the TC-886 and TC-888 models.  NMC is linked to its predecessors as a result of the following transactions: Wollard Airport Equipment Company manufactured and sold the TC-886 as a division of Criton Technologies.  In 1987, Criton Technologies sold all of Wollard Airport Equipment Company's assets and liabilities to WAEC.  Later, in 1994, WAEC sold its all of its assets and certain liabilities to WAEC, Inc.  WAEC, Inc. did not agree to assume liability for potential product liability claims.  However, I found that the product line exception applied to this case, thereby permitting recovery against WAEC, Inc.  Finally, in 2000, WAEC, Inc. merged with NMC, which automatically assumed WAEC, Inc.'s liabilities as a result of the merger.  *See Waters*, 2008 WL 90241, at *1-2, 8.

[18] The ultimate burden of proof on the issue of whether there has been a substantial alternation to a product after it leaves the manufacturer "must be determined on a case-by-case basis.  A plaintiff has the initial burden of demonstrating a defect for which the supplier is responsible. . . . [I]f the defendant contends that the alleged defect was caused by later changes or use, it may be his or her burden to demonstrate this. . . . However, this is so only where the change was not foreseeable."  Pennsylvania Standard Civil Jury Instructions 8.08 subcommittee's note (2005).

[19]  In the e-mail Coscia sent shortly after the incident, Coscia states that he was unaware whether the belt loader had handrails.  (Coscia E-mail at 2).  This is the only evidence defendant

reviewing the record in favor of plaintiffs as I must, the record suggests that the belt loader was not substantially altered after it left the manufacturer. (Waters Dep. 73:2-16 (remembering that belt loaders could not be used without first dispatching handrail per U.S. Airway's policy)). Based on this evidence, a jury could reach the reasonable conclusion that the NMC belt loaders were not substantially altered prior to Waters's injury. *See Ideal Dairy*, 90 F.3d at 743-44. Thus, even assuming that defendant met its burden under Rule 56, plaintiffs have established a triable issue of material fact with respect to whether the belt loader was substantially altered prior to Waters's injury.[20]

Therefore, NMC's motion for summary judgment on the issue of causation must be denied.

**IV.   Conclusion**

The court cannot conclude as a matter of law that the belt loader is not unreasonably

---

proffers that relates to a *possible* substantial alteration, and it is insufficient to establish the absence of a genuine issue of material fact. Waters, whose testimony must be accepted as true for purposes of this motion, testified to the contrary.

[20] In *Warnick*, the court held that the plaintiff was unable to "create a triable issue of material fact that a particular Defendant's loader actually caused their injuries." 512 F. Supp. 2d at 330. The court reasoned that the belt loaders at issue "were made and sold by various manufacturers over two decades, so it is unclear which of those manufacturers made the particular belt loader on which [the plaintiff] injured his thumb." *Id.* at 332. Plaintiff was able to "narrow the field of manufacturers," but was unable to provide enough evidence "to permit a reasonable juror to reach a principled inference that the product which *actually* caused his injuries was made by a particular manufacturer." *Id.* at 333. Importantly, the court also found that the plaintiff had not established that successor liability was applicable. *Id.* at 333-34.
This case differs from *Warnick* because I previously determined that through the doctrines of successor liability and the product line exception, NMC is liable for the belt loaders manufactured by its predecessors. Therefore, unlike the situation in *Warnick*, plaintiffs in this case need only demonstrate that Waters's injuries were caused by a belt loader manufactured by NMC *or its predecessors*, for whom NMC is responsible. Plaintiffs have met this burden.

dangerous. Additionally, the record reveals a triable issue of fact concerning the element of causation. Accordingly, I will deny NMC's motion for summary judgment.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ALBERT WATERS and | : | |
| LISA WATERS, | : | |
| Plaintiffs, | : | CIVIL ACTION |
|  | : | |
| v. | : | NO. 06-0032 |
|  | : | |
| NMC-WOLLARD, INC., | : | |
| Defendant. | : | |
|  | : | |
|  | : | |

## Order

AND NOW this _6_ day of January 2009, upon consideration of defendant's motion for summary judgment (Doc. No. 71), plaintiffs' response thereto, and defendant's reply, **IT IS HEREBY ORDERED** that the motion is **DENIED**.

Trial is **SCHEDULED** for **February 23, 2009** at 10 a.m. in Courtroom 14B.

William H. Yohn Jr., Judge